UNITED STATES of America, Appellee,

v.

John L. MATT, Defendant–Appellant.

No. 96–1614.

United States Court of Appeals,
Second Circuit.

Argued April 25, 1997.

Decided June 4, 1997.

Spiros A. Tsimbinos, Kew Gardens, NY, for Defendant–Appellant.

Elizabeth S. Riker, Assistant United States Attorney, Northern District of New York, Syracuse, NY, for Appellee.

Before: McLAUGHLIN, JACOBS, Circuit Judges, and STEIN, District Judge.*

PER CURIAM:

## BACKGROUND

This is an appeal from the district court's judgment of conviction and sentence entered after a jury trial in which Appellant John L. Matt ("Matt") was convicted of a single count of bank fraud in violation of 18 U.S.C. § 1344. (Munson, S.J.) (N.D.N.Y.). Judge Munson sentenced Matt to a term of imprisonment of one year and one day, three years of supervised release, and a special assessment of $164,041.82.

The evidence at trial showed that at all relevant times Matt controlled three banking accounts. The first was a checking account with the Upstate Federal Credit Union ("UFCU"). The second was a checking account with Key Bank. Key Bank, for a ten dollar fee, allowed Matt to write checks against this account even though checks he had deposited in the account had not cleared. The third was a "Financial Management Account" ("FMA") with Shearson Lehman Brothers ("SLB").

Bank officials from these institutions, FBI agents, and the defendant himself testified that Matt established a scheme whereby he would float checks from one institution to the next, even though he did not have the funds on deposit to support the checks. The scheme worked as follows. Matt would pay for his business expenses with checks drawn on his SLB account. When SLB noticed that Matt did not have sufficient funds on deposit to cover the check, SLB would telephone him

and tell him that he had to deposit funds. An SLB official testified that it was SLB's practice to allow customers time to bring in funds to cover overdrafts.

SLB would only accept bank checks from Matt to cover these overdrafts. Consequently, Matt would write a check drawn on his UFCU account for the amount in question, even though he had insufficient funds in his UFCU account. Because UFCU did not issue official bank checks, he would deposit the UFCU check in his account at Key Bank. For a ten dollar fee, Key Bank would allow Matt to draw a check against this account even though the account contained "uncollected funds." With the check from Key Bank (drawn on an account supported by uncollected funds), Matt would purchase a cashier's check from Key. He would then deposit this cashier's check with SLB. Matt would then write a check on his SLB account to deposit in his UFCU account to cover the original check he wrote to deposit at Key Bank, and the cycle would start over.

SLB notified Matt sometime in early May, 1992 that it would close his account in ten to fifteen days because of administrative problems. On May 18, 1992, SLB closed the account. As a result, the SLB checks on deposit with UFCU did not clear, causing the check he deposited at Key Bank to bounce. Consequently, UFCU lost approximately $104,000, and Key Bank lost approximately $124,000. UFCU was reimbursed by a surety and Matt began to pay the surety monthly payments to repay the debt. Key Bank sued Matt for the amounts owed, and eventually settled for $30,000.

The government indicted Matt on one count of bank fraud in violation of 18 U.S.C. § 1344. The government produced witnesses from each of the three banking institutions to explain Matt's arrangements. The government also produced FBI agents familiar with the investigation into Matt's affairs, both of whom testified that, in their estimation, Matt was involved in a check kiting scheme.

---

* The Honorable Sidney H. Stein, District Judge for the Southern District of New York, sitting by designation.

Matt's principal defense was that he did not intend to defraud the financial institutions because he believed that his account at SLB provided him with overdraft protection and a line of credit, which SLB would extend to him in order to cover the checks he wrote to UFCU. He testified that the termination of this line of credit is what caused UFCU and Key Bank to lose funds. In support of this defense he presented into evidence a brochure describing the Financial Management Account offered by SLB which stated that one of its available features was an "overdraft line of credit." He also produced his accountant, Michael Spohn, to testify that Matt had an overdraft line of credit with SLB, and an expert witness, Helen Chaitman, who testified that Matt had established a *de facto* overdraft line of credit with SLB through a course of dealing. In support of the expert's testimony, Matt noted that on at least one occasion, in September 1990, SLB had paid one of Matt's overdrafts in the amount of $7,620.53.

During trial, Judge Munson vigorously questioned Matt regarding chronology and the series of accounts he maintained. Ms. Chaitman testified that, in her opinion, SLB had extended Matt a line of credit for overdraft protection through a course of dealing. Judge Munson then questioned Ms. Chaitman on whether SLB could make a profit operating Matt's accounts in that fashion. Judge Munson then sought to clarify a portion of Ms. Chaitman's testimony in which she seemed to state that if an SLB statement showed a negative balance at the end of the month, all of the customer's checks must have been paid. The following colloquy took place:

The Court: [T]hat is not true … is it? The checks could have been paid the last day of the month and reflect a negative balance because the deposit was also made that last day of the month and hadn't been recorded, because it was recorded after closing hours.

CHAITMAN: What I testified, your Honor—

The Court: No, I wrote it down. What you testified, you said that there couldn't be a negative balance unless the checks

had been paid throughout the month. Now, that is not correct.

\*   \*   \*   \*   \*   \*

Now, tell me what in your experience and expertise is a classic check kiting scheme?

CHAITMAN: In my experience, Your Honor, a classic check kiting scheme is a real scam.

The Court: I don't know what it is?

CHAITMAN: There's no legitimate underlying business for the flow of funds.

The Court: That is not my experience. That is all right. I don't know who you've been dealing with.

The Court then presented Chaitman with a hypothetical about a check kiting scheme, and asked, "Isn't that a check kite?" Chaitman testified that if the person's intent was to defraud the institution that was issuing the funds, then it was a check kite. However, Chaitman added it may be that the "person's intent is to borrow money because commonly businesses borrow money." The Court responded, "Not that way."

At sentencing, the district court enhanced the offense level pursuant to U.S.S.G. § 2F1.1, based on the loss incurred by the victims of the fraud. The district court took into consideration the full amount of loss incurred by the banks. Matt argued, however, that the district court should not consider those sums which he repaid to the banks after his scheme was discovered.

Matt appeals arguing that: (1) because he believed that his SLB account provided an overdraft line of credit, there was insufficient evidence of an intent to defraud, and his conviction under 18 U.S.C. § 1344 should be overturned; (2) Judge Munson denied him a fair trial by assuming the role of a prosecutor in questioning his defense witnesses; and (3) the judge should not have considered amounts he repaid when enhancing his sentence under U.S.S.G. § 2F1.1.

## DISCUSSION

### A. *Evidence of Intent*

■■■ We review sufficiency of evidence determinations de novo. *United States v.*

*Sirois,* 87 F.3d 34, 38 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 328, 136 L.Ed.2d 241 (1996). A defendant challenging the sufficiency of evidence must persuade the court that, "viewing the evidence in the light most favorable to the government, ... no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Taylor,* 92 F.3d 1313, 1333 (2d Cir.1996) (internal quotation marks and citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997). To prove a violation of the bank fraud statute, the government must establish beyond a reasonable doubt that the defendant intended to defraud the bank. *See United States v. Chandler,* 98 F.3d 711, 715 (2d Cir.1996).

■ Matt argues that his testimony that he believed that he had an overdraft line of credit, coupled with the brochure explaining that an available feature of his SLB account was overdraft protection, the testimony of his accountant and expert that he had an overdraft line of credit, and the fact that SLB paid an overdraft in 1990, preclude the possibility that any rational juror could have concluded that he had the requisite intent to defraud the bank under 18 U.S.C. § 1344. Given the other evidence at trial, however, defendant's argument collapses.

First, while SLB did issue an FMA account brochure describing overdraft protection as an available feature, SLB sent Matt a letter in 1987 indicating that the overdraft line of credit feature was no longer available on FMA accounts. Second, Matt's expert witness opined that, through a course of dealing, SLB provided Matt with a line of credit. This course of dealing apparently included SLB's practice of calling Matt to tell him he had insufficient funds and providing him with an opportunity to cover those accounts. A rational juror could have concluded that the telephone calls to Matt were performed as a courtesy, and did not constitute the extension of a line of credit. Finally, Matt's claim that SLB once covered an overdraft for him in September 1990 should not change the result. First, it is unclear whether in fact it was an overdraft, because Matt's own notations on the bank statement indicated that he deposited sufficient funds in the account two days before the negative balance appeared on his bank statement. Furthermore, even if the Bank did pay an overdraft, a rational juror could have concluded that it should not have raised Matt's expectations to such a level that he believed he had a constant line of credit. Matt argues, in short, that the Bank's policies and practices allowed him to do what he did, and that what he did therefore cannot be check kiting. But a check kiter does not necessarily achieve the illegal end by violating bank policy or practice; a check kiter may also take note of the limitations to each bank's indulgence and then stay within those limits, as a way to keep the scheme in play long enough to build up the undetected credit. Drawing all inferences in favor of the government, a rational jury could have found the intent element of the bank fraud statute beyond a reasonable doubt.

### B. *Questioning Defense Witnesses*

Matt argues that Judge Munson's questioning displayed bias and deprived Matt of a fair trial.

■ "In determining whether a trial judge's conduct deprived a defendant of a fair trial, we must examine the entire record to determine if jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the[ir] determination. The district judge may actively participate and give his own impression, as long as he does not become an advocate for the government. Where the court assumes the role of prosecutor and displays bias, reversal is required. The judge should ask only those questions necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings. If a judge's actions create an impression of partisanship, curative instructions will generally not save the day." *United States v. Leslie,* 103 F.3d 1093, 1104 (2d Cir.) (citations and internal quotation marks omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997).

■ The questioning of Matt was intensive but, viewing the record as a whole, sought merely to dispel the fog shrouding Matt's

numerous bank accounts, reasons for opening such accounts, and the chronology of his affairs. In essence, the questions to Matt aided the jury's understanding of his testimony.

The questions to Matt's expert witness, excerpted above, did not deny Matt a fair trial. First, while the judge made statements that the expert's theories were not correct, the expert stated that perhaps she had not made herself clear. It was reasonable for the judge to ask questions that clarified issues for himself and the jury. Second, after the expert tried to explain her theory of a check kiting scheme, the judge commented that was not his experience, and stated, "I don't know who you've been dealing with." After these comments, however, the judge quickly added that his experience did not matter because he did not know the thoughts of those with whom the expert associated.

Finally, the judge asked the expert a hypothetical about a check kiting. The expert explained that she believed that the judge's example did not illustrate a check kite if the "person's intent is to borrow money because commonly businesses borrow money." The Court responded, "Not that way." Tellingly, however, after this comment, the expert essentially agreed with the judge. Viewing the record as a whole, it is clear that Judge Munson's comments and questions did not deny Matt a fair trial.

## C. *Sentencing*

■ When enhancing Matt's sentence under U.S.S.G. § 2F1.1 for the loss sustained by the victims of the crime, Judge Munson took into account the entire loss suffered by the banks, including the amounts that Matt had repaid after the discovery of the check scheme. Matt argues that the judge should not have considered these amounts, but rather should have subtracted the amounts he repaid.

We have not had the opportunity to review the issue of pre-sentence restitution in a check kiting case, but we have decided analogous cases. In *United States v. Brach*, 942 F.2d 141, 143 (2d Cir.1991), the defendant argued that the district court erred in enhancing his sentence under § 2F1.1 based on the value of a loan which was the subject of a wire fraud conviction. The defendant contended that the court should have considered only the use value of the money. The court pointed out that

> Application Note 7 under section 2F1.1 refers to the commentaries under section 2B1.1 for a discussion of loss valuation. Section 2B1.1 deals with Larceny, Embezzlement, and Other Forms of Theft. Application Note 2 under section 2B1.1 defines "loss" as "the value of the property taken." Application Note 7 under section 2F1.1 states that, "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss."

*Id.* The same reasoning applies to this situation, in which the intended loss was the loss incurred by the banks. In that regard, it does not matter that Matt made restitution to the banks after the scheme was uncovered. Other Circuits have come to the same conclusion in check kiting cases. *See, e.g., United States v. Carey*, 895 F.2d 318, 323 (7th Cir. 1990) (court affirmed sentence based on loss at time of discovery of check kite although at sentencing defendant repaid significant portion); *United States v. Bolden*, 889 F.2d 1336, 1341 (4th Cir.1989) (sentence based on loss at time of discovery of check kite; no consideration of amounts remitted).

It was not error for the district court to enhance Matt's sentence based on the entire loss incurred by the banks at the time of discovery of the offense.

## CONCLUSION

We have considered all of the arguments raised by Matt, and find them to be without merit. Accordingly, the judgment of the district court is AFFIRMED.