UNITED STATES of America,
Plaintiff–Appellee,

v.

Henry L. MARTIN, Defendant–
Appellant.

No. 98–4000.

United States Court of Appeals,
Seventh Circuit.

Argued April 21, 1999.

Decided Aug. 27, 1999.

Gail Joy Hoffman (argued), Thomas P. Schneider, Office of the United States Attorney, Milwaukee, WI, for Plaintiff–Appellee.

Patrick K. Cafferty (argued), Racine, WI, for Defendant–Appellant.

Before BAUER, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

During Henry Martin's trial for bank robbery he asserted as part of his defense that because he was financially secure he had no motive to rob the bank. While cross-examining Martin, the prosecutor inquired about an apparent inconsistency between Martin's assertion of financial security and the indigence he claimed in the financial disclosure form which he filed to obtain a free attorney. As Martin's responses to the prosecutor were somewhat ambiguous and contradictory, the district judge questioned Martin further on some of the points raised. Because this questioning occurred in the presence of the jury, Martin moved for a mistrial claiming that the nature and tone of the court's inquiry amounted to judicial advocacy for the prosecution and suggested to the jury that the court thought Martin was untruthful. The district court denied the motion. Martin appeals and we affirm.

## I.

At 6:53 p.m., on March 19, 1998, a woman (later identified as Lisa McElwee) entered a Tri City National Bank branch in Brown Deer, Wisconsin and displayed a note which read: "give me your money, not bait," and verbally repeated the command.[1] She made off with $1,212, ran into the parking lot, and got into a black car driven by a man. Witnesses testified that the man opened the driver's side door and after she dove into the car over his lap he shut the door, waved to her pursuers, and then sped away. About an hour after the robbery, Henry Martin went to the police and told them that he had been driving in the parking lot near the bank when a woman jumped into his car and forced him to drive her away. The getaway car was his, and to preempt police tracking his license number he presented this carjacking explanation.

On March 25, 1998, the Milwaukee police arrested McElwee and Martin while they were sitting in Martin's car after

---

1. Bait money is real money that tellers keep in their money drawers in case of robbery. The serial numbers of the bills are prerecorded so that the authorities might later determine where the money is spent. Pulling out the bait money also triggers a silent alarm and this money frequently contains a dye capsule which splatters an indelible dye on the money and the thief.

purchasing some heroin. When confronted with a photograph from the bank surveillance camera, McElwee admitted that the picture was of her and told the police that Martin was the driver of the getaway car. She related that she had known Martin for seven years, had previously worked with him at the Social Development Commission, and since 1993 she and Martin frequently would consume heroin together. When the police showed Martin the surveillance photograph he responded that the robber depicted in it was the woman who hijacked his car, but that McElwee was not that person. Subsequently, a grand jury indicted Martin and McElwee for one count of bank robbery in violation of 18 U.S.C. §§ 2113(a) & 2.

McElwee entered into a plea agreement, testified against Martin at his trial, and related how the robbery transpired. On the day of the robbery, Martin picked her up at her house and they went and consumed heroin together. Later, as they were sitting in his car, they hatched their plot after hearing on the radio about a successful bank robbery. McElwee testified that Martin eventually drove her to the bank which she robbed, and that they escaped in his car. They drove to McElwee's mother's house where they counted the money. Martin then told McElwee that he was going to tell the police that a woman shoplifter jumped into his car and forced him to drive away, as he was afraid that someone had seen his license plate. So about an hour after the robbery, Martin went to the police station to report that he had been a victim of a carjacking near the Tri City National Bank. The police immediately doubted his story. They obtained fingerprints from his car which matched those taken during a prior arrest of McElwee. The police then examined a photograph of McElwee from police records and learned that her facial profile matched pictures of the robber taken by the Tri City Bank surveillance cameras.

As the evidence overwhelmingly conflicted with Martin's version of events, he was forced to abandon his initial story and finally admitted at trial that he drove McElwee to the bank, that she robbed the bank, and that the woman who jumped into his car was McElwee. He also admitted the obvious: he had concocted the carjacking story. Martin denied, however, that he knew McElwee was going to rob the bank and stated that he played no role in planning the robbery and did not receive any of the money.

With his credibility severely damaged, a major part of Martin's defense was that he had no need to rob a bank, as he had been receiving severance pay, his wife had a good job, and he had plenty of art, jewelry, and electronic goods which he could have liquidated. So on direct examination, Martin's attorney inquired into these subjects. Despite the leading questions, Martin's answers were vague and ambiguous.

Q. When was the last time you had been employed?

A. I had been employed full-time I think the last date was July 1st of '97.

Q. Were you doing some side work?

A. Yeah. Q. Can you describe that for the jury?

A. Well, periodically I would help people with their pro se petitions.

\* \* \*

Q. Would you receive money to do that?

A. Sometimes.

\* \* \*

Q. How were you paying the bills?

A. First of all I had a pension after my separation from the commission, severance, in the amount of $23,000. I had unemployment compensation. I had tax refunds and things of that nature. My wife makes about $40,-000 a year.

Q. Was your financial situation tight at that time?

A. Very tight. Very tight.

Q. Were you getting by?

A. Oh, yeah.

Q. And were mainly getting by because your wife was working?

A. Yeah, yeah, mainly.

Q. In addition, did you have assets that you could have liquidated?

A. Yeah.

Q. Can you give us a brief description of what those assets were?

A. Well, I have a pretty nice art collection with some nice originals and some prints that are very valuable, and I would estimate they're probably—if I had liquidated them, easily 25, $30,000.

Q. Did you have any electronic equipment that was valuable?

A. Oh, yeah. I have about eight to $10,000 worth of electronic equipment.

On cross-examination, the Assistant United States Attorney began probing in these areas, especially because Martin's testimony seemed to conflict with the assertion of poverty that he made to obtain free legal counsel. Martin first agreed with her statement that he had not worked since July 1997.

Q. You haven't worked since July 1st 1997.

A. That's correct.

But recall that Martin previously testified that he had worked sporadically as a paralegal. Martin's subsequent answers were ambiguous on this point, as he mentions receiving money from an attorney and receiving a tax refund.

Q. Well, at the time of the robbery occurred you were pretty much tapped out.

A. No, I just had gotten a $2300 tax refund and I also had just gotten $600 from Bob Sutton, an attorney in Milwaukee, and $1700 from a friend named Larnell Friend, F–R–I–E–N–D.

Martin then reasserted that he had not been working.

Q. After you were arrested, officers of the court asked you certain questions regarding your finances.

A. Yes.

Q. And they asked you about what your income was and you indicated that it was zero.

A. My income was zero. I didn't have any work.

Martin similarly equivocated on whether government officials previously asked him about his assets.

Q. And you were also asked about your assets.

A. Uh-huh.

Q. Correct?

A. Yes.

Q. And you denied having any assets.

A. I didn't even talk to anybody about my assets. But no, I didn't deny anything. Counsel was appointed for me before I even spoke to anybody.

\* \* \*

Q. At some point someone asked you about money available to you, or items worth money available to you.

A. No, ma'am. Nobody asked me that.

Q. So someone willy-nilly assumed that you had nothing.

A. No, they knew I didn't have a lot of cash lying around. And I guess they assumed that I couldn't afford counsel in this matter. And I couldn't. And that's no lie. I could not afford counsel in this matter.

But later, Martin admitted that he in fact had talked to someone about his assets.

Q. Going back to something that we had talked about earlier, which was your financial situation, and the form that you needed to fill out in order to obtain a court-appointed attorney.

A. Miss, I never filled out a form.

Q. I'm handing you what has been marked as Exhibit Number 14. Would you look at that for a minute.

A. Okay. Uh-huh.

Q. And on the top it says, United States District Court, Eastern District of Wisconsin.

A. Right.

Q. And there's your name, Martin Henry, Leroy.

A. Uh-huh.

Q. And then let's turn, this is a one, two, three—four page document.

A. I signed it. I didn't fill that out. I signed that, yes.

Q. You signed that.

A. Uh-huh, yes.

Q. Now, you're saying you didn't fill it—

A. No, that's not my writing. You can see the difference.

Q. All right, it's not you. But in order for you to sign it, these are questions that someone asked you. Correct?

A. Yeah, I believe they asked them or they had them. I don't know how they got them.

Q. They asked you.

A. I believe that.

Q. This isn't information anyone could obtain without your assistance, correct?

A. I believe that.

Next, the prosecutor addressed Martin's assertion that he had a valuable art collection, despite the fact that he omitted mention of this on his financial disclosure form.

Q. All right. Now I'd like you to turn your attention to "other assets." And it is checked "none." Do you see that?

A. Yes. Uh-huh.

Q. And that's an answer you provided.

A. Yeah. Uh-huh.

Q. And here are examples: Cash on hand, mortgages held by you, or other things of value that you own

or are buying; for example, boats, jewelry, art, computers.

A. Yeah. I didn't have any of those things, Miss.

Q. But you testified that you have 20 to $30,000 worth of art.

A. Yeah, but it doesn't say—oh, yes, it does. I see that. I do see that. That's the art there. Cash on hand, mortgages held or other things of value that you own or are buying, boats, jewelry, art, computers. 2800 net equity. That's what I stated, I suppose. I must have overlooked it. Yes.

Q. Yes, you must have overlooked that. And that is your signature, and that is March 27th, 1998.

A. That's my signature, but that is not my handwriting on either of those pages. Somebody must have took that statement from—

Q. Someone did take that statement from you.

A. Uh-huh, okay.

Later on redirect, in a last-ditch attempt to rehabilitate Martin's credibility, Martin's attorney asked him whether in connection with the financial disclosure form anyone ever specifically asked him whether he had any art worth $30,000. Needless to say, Martin responded that nobody ever asked that specific question. The district judge then sought to clarify the situation by examining Martin in the presence of the jury. He asked Martin to read the disclosure form and tell him if everything on it was accurate.

Q. Mr. Martin, I have some concerns about this Exhibit 14. . . . On the first page, is all the information on that page correct?

\*     \*     \*

A. Yeah, that's pretty correct, yes.

Q. And the information regarding your spouse? And it says there, "Not using wife's income. Defendant

does not know it and did not use her expense." Is that right?

A. Right.[2]

Q. Is that what you told the probation officer?

A. I think he asked me did I know what her expenses were and her actual check, what she said, and I told him—

Q. Is this the information at the bottom there what you told the probation—

A. Yes.

Q. At that time were you receiving unemployment compensation?

A. No. Uh-uh. No, sir.[3]

\* \* \*

Q. Now on page 2, I want you to review that and tell me whether that information is accurate

A. Yeah, that appears to be correct.

Q. No. I don't want "appears." Take your time and read it and tell me whether or not it's accurate.

A. These are estimates. Yes. Those are accurate estimates. When I gave it to him those were accurate estimates except for the rent which is exactly accurate.

\* \* \*

Q. All right. Now turn to page 3 and tell me whether or not that's accurate.

A. Yes, that's accurate.

Q. Now, turn over to page 4. And read that to yourself and then tell me if that's accurate.

A. It's not accurate because there's no art listing there for my art collection. The value of the art collection. And this is my own estimation, it's not a value that I've gotten from an art appraiser or anything.

It's just my own estimation of what I could get for it if I liquidate them.

Q. So it indicates that there are no art assets and there are some assets?

A. True. That's true.

Q. How about the jewelry? A. I have none. I don't have any anymore, Your Honor. I lost my diamond ring. I had a diamond ring and I lost it maybe two to three weeks before this happened. I lost a two-carat diamond ring. It slipped off my hand.

Q. Two to three weeks before what happened?

A. Before I was arrested.

Q. And is the declaration that precedes your signature, did you read that?

A. $2,800 net equity in car?

Q. No. No. It says, "I declare under penalty of perjury." Did you read that?

A. Yes. Yes, I believe that I did, yes. Uh-huh.

Q. And that is your signature.

A. That's my signature, Your Honor.

Q. Now did you read the warning part below that signature?

A. Let me see. Yes, Your Honor.

After the jury was dismissed, Martin's attorney objected to the court's questioning and moved for a mistrial because the court's comments "and the tone of the court's voice with regard to the questioning of Mr. Martin may have unfairly prejudiced Mr. Martin in the eyes of the jury and may have given the jurors the impression that the court thought that Mr. Martin was lying or knew that Mr. Martin was lying."

In orally ruling on the motion, the district judge explained at least one of his purposes for examining Martin:

---

2. Recall that Martin previously testified that he was surviving financially due largely to his wife's salary.

3. Again, recall that Martin previously testified on direct examination that he was receiving unemployment compensation.

The court recognized that this document is part of the basis upon which C.J.A. attorneys are appointed, and if there is a practice or pattern or if it's an individual situation in which somebody is not fulfilling their obligations and their duties with regard to these inquiries, then certainly I want to know about it because I want to correct it. And the fact that it was done in that fashion and the fact that we allowed the defendant to review it to advise us of any inaccuracies, as I recall it there were no inaccuracies except the one to which counsel had previously referred, both counsel in fact, and the defendant has an opportunity to explain how it happened that that was marked none.

So I think that that information is significant to the court, and because the exhibit was already offered and received into evidence, did not contain any information that was not previously produced for the jury.

[Tr. pp. 414–15] The district judge, therefore, denied the motion for a mistrial. The jury eventually convicted Martin of one count of bank robbery. He was sentenced to imprisonment for sixty-two months, three years of supervised release, and a fine of $4,000. Martin now appeals his conviction arguing that the district court erred in denying his motion for a mistrial based on the district judge's interrogation of Martin.

## II.

■ We review the propriety of a judge's examination of witnesses for an abuse of discretion. *Collins v. Kibort*, 143 F.3d 331, 336 (7th Cir.1998). "The examination of witnesses requires judicial supervision." *United States v. Verser*, 916 F.2d 1268, 1272 (7th Cir.1990) (internal quotations omitted). Accordingly, under Fed. R.Evid. 614(b), a judge generally is free to interrogate witnesses to ensure that issues are clearly presented to the jury. Along with other circuits, we have frequently reminded litigants that " 'the function of a federal trial judge is not that of an umpire or of a moderator at a town meeting.' " *Collins*, 143 F.3d at 336 (quoting *United States v. Jones*, 730 F.2d 593, 598 (10th Cir.1984)). Rather than simply being a silent spectator, intelligent questioning by the trial judge is his prerogative. *United States v. Bellomo*, 176 F.3d 580, 596–97 (2d Cir.1999). The occasional questioning of witnesses is one means a judge may use to assist a jury in understanding the evidence. *United States v. Evans*, 994 F.2d 317, 323 (7th Cir.1993) (the basis for judicial interrogation comes from the judge's duty to avoid confusion in the presentation of evidence). Thus, a trial judge may ask those questions he deems necessary in order to clarify an important issue, as long as he remains impartial. *United States v. Webb*, 83 F.3d 913, 917 (7th Cir.1996).

■ Because trial judges wield substantial influence over juries, a judge's discretion to question witnesses is not unfettered. A judge cannot assume the role of an advocate for either side, *Ross v. Black & Decker, Inc.*, 977 F.2d 1178, 1187 (7th Cir.1992), but he can question a witness in an effort to make the testimony clear for the jury. This should not include questions which indicate the judge's belief about a witness' honesty, *United States v. Tilgham*, 134 F.3d 414, 416 (D.C.Cir.1998), especially when a criminal defendant testifies on his own behalf. *United States v. Cantu*, 167 F.3d 198, 203 n. 21 (5th Cir.), *petition for cert. filed*, 67 U.S.L.W. 3749 (U.S. Jun. 1, 1999). Therefore, the initial inquiry in reviewing challenges to a judge's questions to a witness at trial is whether by his conduct the trial judge conveyed to the jury a bias regarding the defendant's honesty or guilt. *United States v. Gill*, 909 F.2d 274, 278 (7th Cir. 1990).

The second inquiry concerns whether the complaining party can show serious prejudice resulting from the trial court's comments or questions. *United States v. Henry*, 136 F.3d 12, 19 (1st Cir.1998); *United States v. Pinkey*, 548 F.2d 305, 310

(10th Cir.1977). Given the challenge before us, we must examine the entire record to determine whether the district judge displayed a bias, and if so, whether this bias affected the jury's decision. *United States v. Leslie*, 103 F.3d 1093, 1104 (2d Cir.1997); *United States v. Pressley*, 100 F.3d 57, 60 (7th Cir.1997). If the court's questions were partial to the prosecution and they could prejudice the jury's decision, then reversal of the conviction could be in order. *Leslie*, 103 F.3d at 1104; *see United States v. Donato*, 99 F.3d 426, 435 (D.C.Cir.1996) (per curiam) ("negative comments directed by trial judge to a defendant or her counsel will warrant reversal 'if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' ").

■ In the present case, we first note that the district judge's stated purpose for interrogating the defendant—to assure that Martin was truly indigent and that the CJA program was being run efficiently—was an important one and it certainly merited some attention. It was not, however, a concern of the jury. "A judge's questions must be for the purpose of aiding the jury in understanding testimony." *U.S. v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998); *see Leslie*, 103 F.3d at 1104 (the trial judge's questions primarily should "clarify ambiguities, correct misstatements, or obtain information necessary to make rulings."). Due to the possibility that the district judge might appear partisan in questioning a defendant, to avoid any claims of bias district judges should inquire into such things as appointment of counsel by questioning the defendant when the jury is not present. If a judicial inquiry is not made for the benefit of the jury, the jury has no need to observe it.

■ But the preservation of the integrity of the CJA program was not the only purpose served by the judge's interrogation. The subject matter of his questions concerned issues which Martin's counsel and the prosecution addressed—Martin's financial condition, the extent to which he was financed by his wife's salary, and his art collection. Martin's responses to counsel on direct examination were sometimes ambiguous and conflicted with the testimony he provided on cross-examination. In interrogating Martin, the judge sought clarification of Martin's answers to questions by both parties concerning his motive, or lack thereof, to rob the bank, which is certainly a relevant issue and a legitimate concern of the jury. For if Martin did indeed own paintings worth $30,000, he may not (as he suggested) have been as needful of money as someone without any assets. Similarly, if Martin were enjoying the benefits of his wife's salary, he may have had a diminished incentive to rob the bank. So, depending on Martin's answers, the judge's questions had the potential to assist or frustrate Martin's defense. Regardless, the questions were posed to clarify Martin's testimony, and the clarification of ambiguities is a legitimate purpose of judicial interrogation of witnesses. *United States v. Messina*, 131 F.3d 36, 39 (2d Cir.1997).

As to any prejudice resulting from the questions, we note that in attempting to clarify Martin's answers, the district judge was firm, but not harsh or abusive in any way.[4] The questions were not laced with skepticism and they gave no indication as to the judge's thoughts about Martin's honesty or dishonesty; rather, the truth or untruth on the subject of inquiry came from Martin's responses. Importantly, the rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover. So to the extent that Martin's argument is con-

---

4. The record also shows that the district judge asked clarifying questions of other witnesses, including witnesses for the prosecution. Because opposing witnesses were subjected to the same scrutiny, the possibility that the judge's questioning of Martin could have been interpreted by the jury as a disapproval of Martin's testimony is minimized.

cerned with the truth made plain by the judicial inquiry, he has no basis for complaint, especially when his earlier testimony covered the subject matter and created some conflict or confusion. The district judge's questions explored earlier contradictory answers. When a defendant gets caught in his own contradictions, he shouldn't blame the district judge for asking relevant questions.

■ But even if the judge's questions suggested that Martin was untruthful, any error was harmless. Certainly the testimony of Martin's partner in crime (McElwee), that Martin fully cooperated in the planning and coverup of the robbery, left a strong impression on the jury. Furthermore, given that the defendant repeatedly admitted to initially lying to the police about his role in the robbery, Martin's "no motive" defense was collapsing under its own weight. As this court has often stated: the propensity to lie to authorities is especially damaging to a witness's credibility. *See, e.g., United States v. Manske,* 186 F.3d 770, 779–80 (7th Cir.1999); *Crivens v. Roth,* 172 F.3d 991, 998 (7th Cir. 1999). This applies not only to the prosecution's witnesses, but also to a witness who is testifying on his own behalf. Martin's distortions were particularly detrimental in this case, as his lies to the police concerned his involvement in the same robbery that he later described much differently to the jury. So it is hard to fathom how the judge's questions could have further undermined Martin's already minimal credibility.

■ It is also important that the district judge gave the jury a cautionary instruction immediately after it returned to the courtroom from the recess that followed Martin's testimony regarding the financial disclosure. At that point the judge stated:

> Members of the jury, you may recall that at the outset I told you that you were to consider only the evidence that is received in this case. I also instructed you that neither by any ruling or by any comment or any question which I may have posed to a witness do I mean to indicate what my opinion is as to the facts or as to what your verdict should be. And I want you to bear that in mind, especially in connection with the court's inquiry regarding Exhibit Number 14.

[Tr. p. 415] Trial judges have broad discretion in determining whether a cautionary instruction as opposed to a mistrial will prevent any possible prejudice. *United States v. Hall,* 165 F.3d 1095, 1116 (7th Cir.1999). We assume that juries follow the courts' instructions. *Id.* Cautionary instructions may cure or diminish any prejudice that could have resulted from the trial judge's comments or questions. *See United States v. Candelaria–Silva,* 166 F.3d 19, 36 (1st Cir.1999); *Bell v. Evatt,* 72 F.3d 421, 434–35 (4th Cir.1995); *Evans,* 994 F.2d at 324.[5] Thus, even assuming *arguendo* that the district judge's comments could have prejudiced the jury in any way, the court's instruction was sufficient to cure the misperception. Therefore, while in hindsight the district court would have been better advised to conduct at least part of its colloquy out of the presence of the jury, the court did not abuse its discretion in declining to grant a mistrial.

AFFIRMED.

---

5. The Second Circuit has adopted a rule that presumes once " 'a judge's actions create an impression of partisanship, curative instructions will generally not save the day.' " *United States v. Matt,* 116 F.3d 971, 974 (2d Cir. 1997) (quoting *Leslie,* 103 F.3d at 1104); *see Messina,* 131 F.3d at 40; *United States v. Filani,* 74 F.3d 378, 386 (2d Cir.1996). While we can conceive of egregious situations where curative instructions would not purge the prejudice caused by communications of bias to the jury, we believe that such cases are rare. In most instances, like the one here, the potential for prejudice from judicial questions can be removed with an appropriate instruction.