In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-2729

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GREGORY A. BARNHART,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05-CR-20018—**Michael P. McCuskey**, *Chief Judge.*

ARGUED FEBRUARY 9, 2009—DECIDED MARCH 26, 2010

Before POSNER and SYKES, *Circuit Judges*, and DOW, *District Judge.*[*]

SYKES, *Circuit Judge.* A jury convicted Gregory Barnhart on two counts of wire fraud—one involving a fraud on a former employer and the other involving a fraudulent scheme to obtain a $500,000 loan from Sun Trust Bank

[*] The Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, sitting by designation.

secured by E. I. du Pont de Nemours and Company ("DuPont"). Barnhart argues that we should reverse his convictions for two reasons. First, he contends that the district judge's questioning of witnesses during his trial displayed an inappropriate bias in favor of the government. Second, he argues that the government prejudicially "paraded" before the jury the factual details of his prior convictions for theft and deceptive practices. Barnhart also challenges his sentence, claiming that the district judge improperly calculated the amount of loss and erred by ordering him to pay restitution based on relevant conduct.

We agree that the judge's questioning of the witnesses during this trial went too far, but it did not prejudice Barnhart's substantial rights given the overwhelming evidence of his guilt. Barnhart's "parading" argument is meritless, as is his contention that the district court improperly calculated the amount of loss. We therefore affirm his conviction and sentence. On the limited issue of restitution, however, a remand is in order; the government concedes that the district court should not have ordered restitution based on relevant conduct, and we agree.

## I. Background

### A. The Frauds

In the spring of 2003, Barnhart approached Paul Tatman, owner of Tatman's Collision Repair Centers ("Tatman's"), to discuss the possibility of purchasing the business.

Barnhart was unable to raise the necessary capital for the acquisition, however, so Paul Tatman instead brought him into the business as an employee to implement improved systems and procedures at the company's four collision-repair service centers. Tatman's issued Barnhart a corporate credit card because the job required Barnhart to travel between these four locations, which were scattered throughout central Illinois. In September 2003, after Barnhart had been working at Tatman's for a few months, the company's accountant alerted Paul Tatman that Barnhart had used the corporate credit card to purchase a home-entertainment system—a plasma television, speakers, a wall mount, and a three-year service plan—for a total cost of $7,919.99. In making the purchase, Barnhart had represented himself as the president of Tatman's. Paul Tatman promptly fired him.

Also in the spring of 2003, Barnhart began seeing—first professionally and later socially—Dr. Sandra Schwartz, a chiropractor who operated a profitable chiropractic practice and had a net worth of roughly $1 million. After he lost his job at Tatman's, Barnhart presented Schwartz with his idea to start a collision-repair company called Blue Star Collision ("Blue Star"), and Schwartz loaned Barnhart $25,000 in November 2003 to start the business. Barnhart used most of that money to pay personal expenses. Over the next six months, Schwartz contributed about half a million dollars in capital to Blue Star with an understanding that she would receive an 85% ownership stake. But the two did not formalize this agreement, and Schwartz never became a shareholder. Barnhart also opened several corporate credit-card ac-

counts in Schwartz's name and used the cards to charge approximately $100,000 in personal expenses.

Despite Schwartz's loans, Blue Star had cash-flow problems, and Barnhart needed to find another source of funds. In the spring of 2004, he entered into discussions with the regional sales representative for DuPont's auto-body unit, and Barnhart and DuPont executed a loan/guaranty/supply agreement in April 2004. Pursuant to the agreement, Barnhart received a $500,000 loan from SunTrust Bank, and DuPont agreed to guarantee the loan in exchange for Barnhart's agreement to purchase all of Blue Star's auto-refinishing paint from DuPont. Schwartz in turn personally guaranteed the loan, and she instructed Barnhart to inform her of all expenditures related to the loan. Exhibit B of the loan agreement required Barnhart to disclose Blue Star's "Indebtedness," which Barnhart listed as "none." Barnhart also represented to DuPont that Blue Star would not be insolvent after the execution of the agreement and agreed that the loan proceeds would be used only to purchase equipment for the body shop.

Soon after Blue Star and DuPont closed on this loan, Schwartz left for a few days to care for her sick mother. When she returned, the loan money was gone. Barnhart had transferred $30,000 into his personal account and used these funds to purchase a hot tub, a four-wheel all-terrain vehicle, a 50-inch plasma television, and to make child-support payments to his ex-wife. (Barnhart appears to have committed the rest of the loan funds to pay off various start-up costs, including equipment and building-

design costs; the government did not question this use of loan proceeds.) Blue Star went out of business soon thereafter, and DuPont was left on the hook to SunTrust for the entire $500,000.

## B. District-Court Proceedings

On May 6, 2005, a federal grand jury in the Central District of Illinois returned an indictment against Barnhart, charging him with three counts of wire fraud in violation of 18 U.S.C. § 1343. Counts One and Two concerned Barnhart's actions when he was employed by Tatman's, and Count Three concerned the $500,000 loan from SunTrust and DuPont. Specifically, Count One alleged that Barnhart committed wire fraud when he purchased a set of custom tires and rims on his Tatman's credit card without authority from his employer. Count Two related to Barnhart's purchase of the home-entertainment system using the Tatman's credit card. And Count Three alleged that Barnhart obtained the DuPont/SunTrust loan through fraud.

The case proceeded to trial. Because this appeal primarily concerns Barnhart's conviction on Count Three—the most substantial of the frauds—we can skip further discussion of the evidence on the other counts. The government's theory regarding the DuPont fraud was that Barnhart intentionally misrepresented that Blue Star had no indebtedness and was not insolvent in order to obtain the loan, and that he fraudulently used some of the loan proceeds to purchase personal items and pay his child-support obligations. Much of the trial

testimony focused on Exhibit B of the loan agreement, which required Barnhart to disclose Blue Star's indebtedness.[1] The government maintained that Barnhart's statement on Exhibit B that Blue Star had no debt was an intentional falsehood; the prosecution marshaled substantial evidence establishing that the loan agreement required Barnhart to list *all* Blue Star indebtedness and that Blue Star had around $1.1 million of debt at the time he executed the agreement.

Besides the loan documents, the evidence included copies of Blue Star's financial statements and testimony

---

[1] The loan agreement is not a model of clarity. Apparently, no part of the loan agreement explicitly stated what should be listed in Exhibit B, which was titled "Indebtedness." The contract itself defined "Indebtedness" in a rather comprehensive manner. It also defined "Authorized Indebtedness" as:

> (i) Indebtedness under the Loans; (ii) purchase money indebtedness; (iii) capital lease obligations; (iv) unsecured current liabilities (other than liabilities for borrowed money or liabilities evidenced by promissory notes, bonds or similar instruments) incurred in the ordinary course of business and either (A) not more than ninety (90) days past due, or (B) being disputed in good faith by appropriate proceedings with reserves for such disputed liability; (v) other unsecured Indebtedness not to exceed Fifty Thousand Dollars ($50,000) in the aggregate at one time outstanding; (vi) loans obtained from Blue Star Collision shareholders and (vii) *the Indebtedness specifically listed on Exhibit B*.

(Emphasis added.) As we explain later, the parties offered competing interpretations of the agreement.

from Dorothy Lierman, a certified public accountant who worked for Blue Star in 2004. Lierman testified about the company's general financial situation and its indebtedness at the time of the loan transaction. She also explained that "insolvency" meant either that a company's liabilities exceeded its assets or, more generally, that a company was unable to meet its regular debt obligations, and that under either understanding, Blue Star was obviously insolvent when Barnhart executed the loan agreement. She told the jury that in May 2004—just after the loan was closed—Blue Star's liabilities exceeded its assets by at least $100,000 and possibly as much as $500,000. She said Barnhart would have been well aware of the company's indebtness and insolvency.

The government also offered the testimony of Gelsomina Paolini, the loan manager at DuPont who handled the transaction. Paolini testified that the only financial information she received from Blue Star after February 2004 was confirmation that Schwartz had contributed more than $500,000 to the company. DuPont apparently classified this as "investment capital" based on its identification as an "undocumented loan"—an unsecured loan of a shareholder on which there was no maturity date. Regarding Barnhart's fraudulent use of the loan proceeds, the government established that Barnhart quickly spent $30,000 of the loan proceeds on personal expenses.

Barnhart's defense consisted primarily of his own testimony and that of an attorney who represented

Blue Star during the loan negotiations. As to the allegation that he misrepresented Blue Star's indebtedness, Barnhart claimed that the loan agreement did not require him to disclose all of Blue Star's indebtedness and that even if it did, he did not intend to deceive DuPont when he wrote "none" on Exhibit B. Jeffrey Davis, Blue Star's counsel during the transaction, testified that Barnhart's disclosures on Exhibit B were arguably not improper. The attorney said the agreement never made clear what debt should be listed on Exhibit B; he described what he said was the confusing interaction between the defined terms "Indebtedness" and "Authorized Indebtedness" in the contract—both of which (he contended) were used to describe existing and future indebtedness.

Barnhart claimed that he informed DuPont about Blue Star's financial condition long before the consummation of the loan. He readily acknowledged that Blue Star's liabilities exceeded $1 million at the time the loan closed, but he said he disclosed the company's financial situation months earlier by sending DuPont a Blue Star prospectus. Paolini confirmed she received the prospectus and acknowledged on cross-examination that DuPont had relied on it to classify the loan was "high risk." Finally, Barnhart testified that he believed Blue Star could use the loan funds for business expenses such as payroll, and he characterized the $30,000 that he took for personal use as "payroll" because he had not received a salary for several months. Any misunderstanding on this point, he claimed, was simply a mistake rather than evidence of intent to defraud.

During the testimony of prosecution and defense witnesses alike, the judge interjected with questions of his own. Barnhart did not object at the time, but the judge's questioning of the witnesses figures prominently in his appeal. The jury returned guilty verdicts on Counts Two and Three but was unable to reach a verdict on Count One. In calculating the amount of loss to determine Barnhart's advisory Sentencing Guidelines range, the judge included Barnhart's fraudulent conduct against Schwartz as relevant conduct. The judge sentenced Barnhart to 78 months' imprisonment and ordered him to pay restitution of $500,000 to DuPont and $604,070.42 to Schwartz. This appeal followed.

## II. Discussion

### A. Judicial Questioning of Witnesses

Barnhart's primary claim on appeal is that the district judge's questioning of witnesses was highly prejudicial and either overtly or subtly conveyed a bias in favor of the government. A claim of this type requires us to make two inquiries: "First, we inquire whether the judge in fact conveyed a bias regarding the defendant's honesty or guilt. If so, we consider whether the complaining party has shown serious prejudice resulting from the district court's comments or questions." *United States v. Washington*, 417 F.3d 780, 784 (7th Cir. 2005) (citation omitted). We evaluate the judge's questioning of witnesses in the context of the entire trial and not in isolation. *See United States v. Martin*, 189 F.3d 547, 554 (7th Cir. 1999). "If the court's questions were partial to the pros-

ecution and they could prejudice the jury's decision, then reversal of the conviction could be in order." *Id.*; *see also United States v. Verser*, 916 F.2d 1268, 1272-73 (7th Cir. 1990) (explaining that a district judge's duty to avoid giving an "impression to the jury that the judge believes one version of the evidence and disbelieves or doubts another" is "[f]undamental to the right to a fair trial" (quotation marks omitted)).

But where, as here, the defendant failed to make a timely objection to the district judge's questioning, we analyze the claim of improper signaling through the lens of plain-error review.[2] *See* FED. R. CRIM. P. 52(b). This means Barnhart must establish that (1) an error has occurred; (2) that it was "plain" in the sense that it was clear; (3) that it affected his "substantial rights"; and (4) that it "seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Askew*, 403 F.3d 496, 503 (7th Cir. 2005).

District judges have broad discretion in conducting trials and may question witnesses during direct or cross-examination to clarify testimony or assist the jury's under-

---

[2] At oral argument Barnhart suggested that preserving an objection in this context is impractical because of the obvious sensitivity of objecting to the judge's conduct in front of the jury. We have previously acknowledged the awkwardness of preserving a claim of judicial bias. *See United States v. McCray*, 437 F.3d 639, 644 (7th Cir. 2006). Nevertheless, the objection must be made; but nothing in Federal Rule of Evidence 614(c) requires this to be done in the jury's presence.

standing of the evidence. *See* FED R. EVID. 614(b); *United States v. McCray*, 437 F.3d 639, 643 (7th Cir. 2006). But the judge's discretion to question witnesses is not unfettered; the judge may not "assume the role of an advocate for either side" by either signaling through his questions that he thinks a witness is not credible or suggesting that he disbelieves a party's theory of the case. *Martin*, 189 F.3d at 553.

Barnhart argues that the judge's questioning of both defense and prosecution witnesses was so one-sided that it conveyed the clear impression that the judge thought the government's case was strong and Barnhart's defense implausible. He points first to the judge's questioning of Jeffrey Davis, Blue Star's counsel during the loan negotiations. Davis testified about his understanding of the loan agreement's definition of indebtedness and what he said were its confusing instructions about how to disclose Blue Star's indebtedness. During cross-examination, the prosecutor sparred with Davis over the proper interpretation of the agreement. Davis tried to explain that the confusion stemmed from the agreement's use of the terms "indebtedness" and "authorized indebtedness." At this the district judge interrupted:

> THE COURT: If DuPont knew there was $1.1 million worth of indebtedness, would they have made this loan?
>
> THE WITNESS: I do not know. I don't know what was in the—probably not with the balance sheets that they—
>
> THE COURT: Especially if one document says "none" and another document says "1.1 million." That's a big variance, isn't it?

THE WITNESS: Yes. And I think that the issue is . . . that the definition of "authorized indebtedness" sets forth all those items which are authorized pursuant to the agreement, which lists all of (i) through (vi), and then has a second catch-all which would cover anything that wasn't covered through (i) through (vi).

THE COURT: But they were trying to get their money guaranteed and not put themselves in a position they'd have to fight anybody else, right?

THE WITNESS: Yes, sir.

These leading questions read like a cross-examination. The first question forced Davis to speculate without foundation as to the materiality of Barnhart's representations, and it also tacitly rejected the defense theory that DuPont was sufficiently informed of the status of Blue Star's debt by the prospectus Barnhart provided months before the loan closed. The second and third questions largely dismissed Davis's proffered interpretation of the contract, by which he tried to explain the variance between Blue Star's actual indebtedness and Barnhart's representation on Exhibit B. In short, the exchange strongly suggests that the district judge doubted the plausibility of both Davis's testimony in particular as well as the overall defense theory that Barnhart merely misunderstood the terms of the loan agreement and did not knowingly deceive DuPont.

Barnhart also directs us to several questions from the judge which served to emphasize uncontested facts that were highly unfavorable to the defense. For example, the judge repeatedly asked Davis and Barnhart to admit that

Barnhart controlled access to all of Blue Star's financial information. Davis had already testified that Barnhart never shared Blue Star's balance sheet with him and explained that he usually does not see a client's financial information. When Davis moved on to explain what he meant by the phrase "undocumented loans," the judge interrupted his explanation to return to his testimony that Barnhart never supplied him with Blue Star's financial statements.[3] The judge also jumped in during a series of questions to Davis about what Barnhart was required

---

[3] Davis testified on cross-examination that he told DuPont that the loans were "undocumented." The prosecutor showed him a copy of Blue Star's balance sheet to demonstrate that the loans were reflected on the company's books. Davis said that was not what he meant by "undocumented" and tried to explain that he was referring to a loan without a promissory note setting forth repayment terms or interest rates. The judge interrupted:

THE COURT: Had [Barnhart] ever presented this [balance sheet exhibit], a copy of this to you?

THE WITNESS: Not this balance sheet, no.

THE COURT: Had anybody—or, well, had [Barnhart] presented to you the number of $433,532.57 [the loan amount specified on the balance sheet]?

THE WITNESS: I knew that that's the approximate amount of [Schwartz's] initial, her initial investment. Yes.

THE COURT: Okay. And that came from him?

THE WITNESS: Correct. And it was, it was—again, when we originally met, that was—it was supposed to be a million dollars; but, again, that number came from [Barnhart].

to disclose concerning Blue Star's indebtedness.[4] Later,
when Barnhart contended that the prospectus he sent to
Dupont had sufficiently disclosed Blue Star's financial
situation, the judge interrupted to get him to confirm he
had never given Davis a copy of the prospectus.[5] These

_____

[4] Davis continued to press the notion that the only debt that
needed to be reported on Exhibit B was unauthorized debt and
explained that all other debt would have been disclosed on the
balance sheets. The following exchange then followed between
the district judge, Davis, and the government:

> THE COURT: And any balance sheet that was sent to
> DuPont by Mr. Barnhart, you never saw that?

> THE WITNESS: I did not see those balance sheets. No.

> MR. BASS: So you're not disputing that DuPont had asked
> for and was interested in finding out about what debt,
> regardless of what it was, Blue Star had before it made this
> loan . . .[?]

> THE WITNESS: I'm not disputing that . . . . The only thing
> I was disputing was what would fall on Exhibit B.

[5] At this point in Barnhart's cross-examination, the prosecutor
showed Barnhart a copy of the prospectus, which contained an
explanation that Blue Star anticipated approximately $1 million
in debt when it opened its doors. Barnhart testified that he gave
this prospectus to his contact at DuPont in either February or
March of 2004. The judge then asked:

> THE COURT: And I think you presented it to [the contact]?

> THE WITNESS: That's correct.

> THE COURT: And Mr. Davis testified that he never saw
> that; is that correct?

(continued...)

questions gave the impression that the judge was skeptical of Barnhart's claim that he did not willfully withhold information about Blue Star's debt.

The judge also questioned the government's witnesses, and although most of this was innocuous,[6] we are troubled by one particular passage in the testimony. During cross-examination of Lierman, Blue Star's accountant, Barnhart's trial counsel was attempting to establish that the concept of "insolvency" could have a different meaning to a certified public accountant than to a lay businessperson. Barnhart's counsel asked Lierman to restate the definition of the term she had used on direct examination so he could compare it to his own proposed layperson's

---

[5] (...continued)

>     THE WITNESS: Yeah. He would not have.
>
>     THE COURT: Okay.

[6] For example, near the end of Paolini's direct examination, the judge asked her to confirm that "[b]ased on the representations made, you made a business decision that the business could have sufficient income to pay that monthly . . . debt [on the loan]?" Even though this question asked Paolini to summarize a portion of her testimony that was detrimental to Barnhart, it was well within the appropriate zone of discretion; judges are permitted to ask witnesses to summarize their testimony as an aid to jurors. Although we have previously held that too many clarifying questions may operate to impermissibly reinforce testimony detrimental to the defendant and amount to improper judicial signaling, *see United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005), this is not such a question.

definition. After Lierman restated the definition, the judge said to her: "And so that's what you would define then as insolvency with your 30-year experience, your education, is that there's not sufficient money coming in to pay the bills that need to be paid on a monthly basis?" This attempt to bolster the prosecution's witness took the wind out of the sails of the defense attorney's cross-examination.

Considered as a whole and in light of the entire trial, the judge's questioning of the witnesses went beyond mere clarification and instead gave the impression that the judge disbelieved Barnhart's defense.[7] Trial judges need not be silent spectators, but they *are* neutral arbiters; the quantity and quality of the judge's questions in this case conveyed an improper skepticism about Barnhart's defense. This was error, but whether it affected Barnhart's substantial rights is another matter.

To establish prejudice, Barnhart must show that but for the judge's improper questioning, he probably would not have been convicted. *See United States v. Olano*, 507 U.S. 725, 734 (1993). That is, if the evidence of guilt is over-

---

[7] Barnhart's argument properly takes issue with the effect of the judge's questions and not with the effect of damaging responses to otherwise neutral clarifying questions. The distinction is critical in cases alleging improper judicial signaling. "[T]he rule concerning judicial interrogation is designed to prevent judges from conveying prejudicial messages to the jury. It is not concerned with the damaging truth that the questions might uncover." *Martin*, 189 F.3d at 554.

whelming, this type of error can be considered harmless. *See United States v. Paladino*, 401 F.3d 471, 478 (7th Cir. 2005). Although the trial judge's influence on the jury is ordinarily "of great weight," *Quercia v. United States*, 289 U.S. 466, 470 (1933) (quotation marks omitted), the risk of prejudice from judicial questioning can be minimized if, as here, the judge issues an instruction at the close of the case reminding the jury that nothing he said should be construed as an opinion about the evidence or to suggest what the jury's verdict should be. *See, e.g.*, *McCray*, 437 F.3d at 644. Such an instruction might not entirely erase the suggestive effect of one-sided questions from the judge,[8] but it limits the degree of influence the questions might otherwise have on the jury's deliberations and may permit a conclusion that the judge's error was not prejudicial. This is especially true where, as here, the evidence of guilt is very strong. We are confident that the judge's questions to the witnesses, though they crossed the line, did not affect the outcome of this trial.

The basic facts of the case—the details of the DuPont loan transaction, Blue Star's indebtedness and insolvency, and Barnhart's misappropriation of the loan proceeds for personal use—were not in dispute. The verdict turned

---

[8] Although jurors are presumed to follow limiting or curative instructions, in this as in other contexts, a limiting instruction may be insufficient to fully or even partially cure a trial error. *Cf. United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002) ("[J]urors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds.").

on the question of Barnhart's intent—whether he intended to defraud DuPont when he represented that Blue Star had no indebtedness and was solvent, and when he used $30,000 of the loan funds for personal expenses, including the purchase of a 50-inch plasma television, a hot tub, an all-terrain vehicle, and payment of back child support.

Let's start with the misuse of the $30,000. Barnhart claimed that he honestly thought he could use the loan proceeds to pay general business expenses, including "payroll," and that the $30,000 represented his salary. Implausible on its face, the prosecution's evidence overwhelmingly contradicted this claim. First, using any of the loan money for "payroll" was plainly in violation of the loan agreement, which stipulated that the funds were to be used only for purchasing auto-body machinery. Second, that the $30,000 went primarily toward the purchase of luxury personal items severely undermines the already implausible claim that the money represented Barnhart's "salary." Finally, Barnhart's history of fraud— as represented by his cynical deception of Schwartz and his convictions for theft and deceptive practices—made his claim of innocent intent simply unbelievable.

Likewise, Barnhart's efforts to explain away his misrepresentations regarding Blue Star's solvency and lack of indebtedness must be seen in light of the obviously fraudulent endgame of this scheme, as well as his ongoing fraud against Schwartz and his other convictions. Whatever plausibility his innocent explanation for these misrepresentations might have had (and there wasn't much), it evaporates when considered in light of

the rest of his conduct. The best piece of evidence in his favor was Paolini's acknowledgment that he had given her a copy of Blue Star's prospectus in February 2004; it listed roughly $1.1 million in expenditures, and Barnhart argued that DuPont should have realized that these expenditures would be liabilities by April 2004 when the parties negotiated and executed the loan agreement. But what DuPont should have known is not really the point; the rest of the evidence overwhelmingly established Barnhart's intent to defraud.

In short, although the judge's questions went too far, Barnhart has not established that they were prejudicial. Accordingly, while we agree there was error, it was not so significant as to affect his substantial rights or require correction under plain-error review.

## B. "Parading" Barnhart's Prior Conviction

Barnhart also claims that the government improperly "paraded" the facts underlying his convictions for theft and deceptive practices, admitted for impeachment purposes. He acknowledges that the government was permitted to go beyond establishing the mere fact of these convictions (permitted under Rule 609(a)(1) of the Federal Rules of Evidence) and question him regarding the specific conduct underlying his convictions pursuant to Rule 608(b) (permitting cross-examination regarding specific instances of conduct bearing on a witness's character for truthfulness). Barnhart argues instead that the government went too far and exploited the facts involved in his theft and deceptive-practices convictions. For

support he relies on *United States v. Smith*, 454 F.3d 707 (7th Cir. 2006); *United States v. Robinson*, 8 F.3d 398 (7th Cir. 1993); and *Campbell v. Greer*, 831 F.2d 700 (7th Cir. 1987), but those cases are inapplicable. Both involved impeachment by prior conviction when the conviction was offered under Rule 609, which restricts the introducing party to "identify[ing] the particular felony charged, the date, and the disposition of a prior conviction." *Smith*, 454 F.3d at 716.

Here, as we have noted, Rule 608(b) permitted the government to cross-examine Barnhart regarding the facts underlying his theft and deceptive-practices convictions because he was a witness and the convictions related to his character for truthfulness. Rule 403 may in some cases limit or prohibit this line of questioning if its prejudicial effect would substantially outweigh its probative value. But that's not the case here. The central focus of this case was Barnhart's intent to defraud. The underlying facts of his theft and deceptive-practices case involved a $40,000 fraud on a friend in connection with the ostensible purchase of a luxury suite at the Daytona Speedway. This course of conduct is highly relevant to Barnhart's character for truthfulness. The government's cross-examination on the specifics of Barnhart's prior convictions was entirely appropriate.

### C. Barnhart's Sentence and Restitution Order

Barnhart challenges his sentence and restitution order on two grounds. First, he argues that the district judge erred in determining the amount of loss by including the

funds Schwartz provided through loans and credit-card charges as relevant conduct. Second, Barnhart contends that the court erred in ordering him to pay restitution based on this relevant conduct. The government correctly concedes that the district court erred in its restitution order; losses resulting from relevant conduct are not properly within the scope of restitution. *See United States v. Frith*, 461 F.3d 914, 920-21 (7th Cir. 2006). Barnhart is entitled to a remand for modification of the judgment to remove that amount from the restitution order.

As for the loss amount, the district court concluded that Barnhart caused a total of $1,104,070.42 in losses—$604,070.42 to Schwartz and $500,000 to DuPont. Specifically, the court found that the fraud against Schwartz was "inextricably intertwined" with the fraud against DuPont and could be considered relevant conduct under U.S.S.G. § 1B1.3(a)(2). We review this determination for clear error. *Frith*, 461 F.3d at 917. Barnhart challenges this loss calculation on two grounds. He claims there is no evidence Schwartz's loss resulted from criminal conduct, and he argues it was not sufficiently related to the scheme to defraud DuPont to count as "relevant" conduct. Both arguments are without merit.

"A defendant who challenges a district court's loss calculation carries a heavy burden, for he must show that the calculation was not only inaccurate, but also outside the realm of possible computation." *United States v. Wheeler*, 540 F.3d 683, 693 (7th Cir. 2008) (quotation marks omitted). Under the guidelines relevant conduct includes "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the

offense of conviction." U.S.S.G. § 1B1.3(a)(2). Applying this standard, the district court properly concluded that Barnhart's deceit of Schwartz amounted to a criminal fraud. Schwartz loaned Barnhart in excess of $500,000 based on his false promise that she would have an 85% ownership interest in Blue Star. Barnhart instead used much of this money for personal expenses, including luxury personal items and a trip to the Cayman Islands. Considered in light of his fraudulent schemes against DuPont and Paul Tatman, his deception of Schwartz easily qualifies as a criminal fraud.

Barnhart's claim that this conduct was not sufficiently intertwined with his fraud on DuPont is equally unavailing. The commentary to the guidelines notes that a "common scheme or plan" for purposes of a relevant-conduct finding exists where the two acts are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* § 1B1.3 cmt. n.9(A). The commentary further states that two acts are part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* cmt. n.9(B). The two frauds at issue here easily satisfy this standard. They overlapped in time, in context, and in their ultimate objective. Both the fraud on Schwartz and the fraud on DuPont involved Barnhart's use of Blue Star to obtain money for his personal use. Barnhart's ongoing deception of Schwartz helped make his deception of DuPont possible.

This case is not, as Barnhart claims, like *United States v. Coffman*, 94 F.3d 330, 337 (7th Cir. 1996). There, we concluded that a fraudulent scheme to induce one group of investors to purchase stock was not sufficiently related to a separate fraudulent scheme two years later to borrow money from a bank using the same stock as security. Here, in contrast, Barnhart's two fraudulent schemes were nearly contemporaneous and so intertwined that it would have been difficult to carry out each one independently.

Accordingly, for the foregoing reasons, we conclude that although the district court's questioning of the witnesses during Barnhart's trial was improper, this error did not prejudice Barnhart's substantial rights in light of the overwhelming evidence against him. There was no evidentiary error in the use of Barnhart's prior convictions for theft and deceptive practices, and the district court's loss calculation was correct. The restitution order, however, should not have included amounts attributable to loss from relevant conduct. Accordingly, we AFFIRM the convictions and sentence but VACATE the restitution order and REMAND for limited further proceedings consistent with this opinion.