# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2455

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DANIEL W. CURRY,                    *Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 06 CR 11—**Larry J. McKinney,** *Judge.*

———————

ARGUED APRIL 1, 2008—DECIDED AUGUST 15, 2008

———————

Before CUDAHY, RIPPLE and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* On May 9, 2006, Daniel Curry was indicted on four counts of armed bank robbery, in violation of 18 U.S.C. § 2133(a) and (d), and four counts of using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). A jury convicted Mr. Curry on all counts, and the district court sentenced him to 1,071 months' imprisonment, five years of supervised release and restitution in the amount of $1,052,337.65. For the reasons set forth in this opinion, we affirm his conviction and sentence.

# I

# BACKGROUND

## A.

This case involves a series of armed bank robberies that occurred in central and western Indiana between 2003 and 2006.

The first robbery took place on April 9, 2003, when two armed men entered a branch of the Terre Haute First National Bank. One of the men, brandishing a handgun, controlled the lobby, while the other man gained access to the bank's vault. The subjects stole approximately $311,793 from the bank. They then fled the scene in a maroon BMW coupe that had been reported stolen from the Terre Haute area the previous day.

Witnesses described the perpetrators as two older white males; however, they were unable to give a more detailed description because the perpetrators' features had been obscured by the heavy winter clothing, wigs, sunglasses and fake facial hair that the men had been wearing. The stolen coupe that had been used as the getaway car later was recovered in a nearby parking lot. Its owner reported that his silver handgun, which he had kept in the glove box of the car, was no longer inside the vehicle.

Similarly, on February 9, 2005, a branch of Old National Bank in Terre Haute, Indiana was robbed of approximately $394,108 by two men brandishing handguns. The perpetrators again were described as two white males wearing hooded sweatshirts, baseball caps, gloves, sunglasses, fake moustaches and artificial beards. After conducting the

robbery, the individuals fled in a stolen Mercury Grand Marquis. Officers later recovered the Grand Marquis and another stolen vehicle, a Pontiac Grand Prix, in close proximity to the bank. A brown cloth glove was found on the driver's seat of the Grand Prix.

The third robbery occurred on December 9, 2005, at a branch of Regions Bank in Kokomo, Indiana. In a manner similar to that of the Terre Haute robbery, two armed men displaying silver handguns entered the bank and stole approximately $118,961. The subjects fled the scene in a maroon 1996 Dodge Stratus. A car with that same description had been reported stolen from Greenwood, Indiana, three days prior to the robbery. Witnesses described the robbers as two white males wearing heavy winter clothing, wigs, sunglasses and fake facial hair.

The final robbery occurred on January 19, 2006, when a branch of Fifth Third Bank in Terre Haute, Indiana was robbed of approximately $237,563. Like the other robberies, this one was conducted by individuals described as older white males wearing bulky winter clothing, baseball caps, wigs, sunglasses and artificial facial hair, and armed with silver handguns. Unlike in the other robberies, however, the teller at this bank managed to include red dye packs inside the bundles of money that she passed to the robbers. These dye packs were designed to explode within ten seconds of passing a sensor located at the front door of the bank. Witnesses reported seeing the red dye packs explode as the robbers left the building.

The robbers drove away from the Fifth Third Bank in a stolen blue Geo Tracker. This vehicle later was recovered

a few blocks from the bank, with large red dye stains on the floor. A Pontiac Montana, which had been reported stolen from Crawfordsville, Indiana earlier that day, also was recovered near the bank. Investigators found a fake beard and a fake moustache in the seating area of the stolen Montana.

On four occasions in early 2006, soon after the Fifth Third Bank robbery, Mr. Curry appeared at various banks in Bloomington, Indiana, where he conducted transactions using large quantities of cash heavily stained with red dye. During two of these transactions, Mr. Curry told the bank teller that he had won the red-stained money in a poker game. During another of these transactions, Mr. Curry told the bank teller that the money became stained when he accidentally had washed it in the washing machine with some red clothing.

The FBI was notified of these transactions, and it began monitoring Mr. Curry. On February 8, 2006, an FBI agent observed Mr. Curry purchasing chips at the Caesar's Riverboat Casino in Elizabeth, Indiana, using large quantities of red-stained bills. The agents also observed him, on several occasions, entering and leaving a storage facility in Martinsville, Indiana, where a storage unit was registered in his name. On February 10, 2006, FBI agents obtained warrants to search Mr. Curry's residence and storage locker.

When the agents executed the search warrant for Mr. Curry's residence, they found more than five thousand dollars in cash, including bills bearing bank straps from Regions Bank and bills stained with red dye, hidden inside

a work bench in Mr. Curry's garage. Their search of the storage locker recovered a red gym bag, embroidered with Mr. Curry's name, which contained a wig, sunglasses, artificial facial hair, liquid latex, baseball hats and two ski masks. They also found a bag of .38 caliber bullets, multiple hooded jackets and more than $140,000 in cash, much of which was stained with red dye and/or wrapped in bank straps bearing the names of the banks that had been robbed. Additionally, the locker contained the Lorcin .38 caliber handgun that had been stolen from the BMW coupe used in the April 9, 2003 robbery; it, too, was covered in red dye. After the searches, the agents arrested Mr. Curry.

The subsequent investigation uncovered even more evidence. Motel records showed that Mr. Curry had been staying in Crawfordsville, Indiana on the day that the Pontiac Montana, the car that had been used as the "switch car" in the January 19 Terre Haute robbery, had been stolen. Mr. Curry had checked out of his motel in Crawfordsville at 5 a.m. on January 19, just hours before the Terre Haute robbery occurred. Cellular telephone records also placed Mr. Curry's cell phone in Crawfordsville that morning and in Terre Haute a few hours later, near the time of the robbery.

Furthermore, agents conducted forensics testing on the fake beard and fake moustache that were found on the seat of the stolen Montana and the glove that was found inside the stolen Grand Prix. DNA recovered from the beard and from the glove was traced to Mr. Curry. DNA recovered from the moustache, however, was linked to Mr. Curry's brother, Arthur Curry.

Arthur Curry was arrested soon thereafter in North Carolina. A search of Arthur Curry's residence recovered approximately $85,000 in red-stained currency, marked bills from the January 19, 2006 robbery, bank straps bearing the names of the victim banks in the last two robberies and various disguises.

**B.**

On May 9, 2006, Daniel Curry and his brother, Arthur Curry, each were indicted with four counts of armed bank robbery, in violation of 18 U.S.C. § 2133(a) and (d), and four counts of using a firearm in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Arthur Curry entered a guilty plea. Daniel Curry, however, proceeded to trial.

At Mr. Curry's trial, the Government presented the testimony of eleven employees who had been working at the various victim banks at the time that they had been robbed. These witnesses described the perpetrators and their unique attire, as well as the similar method of the robberies. The Government then presented the testimony of the officers and agents who had investigated Mr. Curry. These witnesses testified regarding Mr. Curry's attempts to pass the red-stained money at banks and casinos; they also testified regarding the red-stained money, bank straps, stolen gun and gym bag full of disguises that they had found in the search of Mr. Curry's residence and storage locker.

Furthermore, the Government introduced into evidence the surveillance footage from the bank robberies. It pro-

duced the false facial hair and the glove that were found inside the stolen getaway vehicles; a forensics analyst testified that Mr. Curry's DNA was found on both the glove and the false beard. The relevant items found inside Mr. Curry's garage and storage locker also were admitted into evidence. Finally, the Government introduced copies of motel and phone records that placed Mr. Curry in Crawfordsville, Indiana, a few hours before a car stolen from Crawfordsville was used in a bank robbery in Terre Haute.

Mr. Curry chose to testify in his own defense at trial and deny any involvement in the robberies. He suggested instead that his brother, Arthur, had perpetrated these crimes with another, unidentified individual. He testified that Arthur Curry had a key to his storage locker, and he asserted that the incriminating items recovered there had belonged to Arthur, not him. Mr. Curry explained that he had loaned his cell phone to his brother on January 19, 2006, and the calls made from Crawfordsville and Terre Haute likely had been made by Arthur. In an effort to explain why the analysts had found Mr. Curry's DNA on the false beard, he testified that he had visited his brother in North Carolina, and while he was there, the brothers had put on the costume facial hair as a joke. He further explained that his brother had owed him a significant amount of money from a joint business venture, and that the red-stained money in his possession had been given to him by Arthur as repayment for the loan. Mr. Curry also noted that he was significantly shorter than the bank robbers, as at least one witness had described them, and he testified regarding his numerous recent health problems.

Finally, Mr. Curry acknowledged that he had not been truthful when questioned by FBI agents regarding the red-stained money, but he explained that this was because he had been afraid and did not want to implicate his brother in the bank robberies.

During Mr. Curry's testimony, the Government inter-rupted him each time he began to testify about his conver-sations and interactions with his brother Arthur. Each time, the Government objected to his testimony on the ground that it would be inadmissible hearsay. The court sustained the objections and prohibited Mr. Curry from testifying about conversations that he had held with his brother.

In rebuttal, the Government presented the testimony of one of the investigators who had interviewed Mr. Curry. The witness explained that Mr. Curry had told him a very different story at the time of his initial interview. The officer also pointed out numerous statements in Mr. Curry's trial testimony that contradicted the statements that had been given to him initially.

Shortly after the Government's rebuttal, the court received a question from one of the jurors. Entitled "hearsay," it asked: "Why do some witnesses get to tell the Court what someone else said, like tellers can say what another teller said, but some witnesses can't say what another person says, like the defendant couldn't say what his brother said?" Tr.IV at 480.

The next morning, before closing statements, the district judge notified the attorneys that he was going to answer the juror's question in front of the entire jury because he thought that it evidenced a potential mistrust of the court or of the system. He then addressed the jury:

So I got a question from one of you today, and I want to address it. And I want to address it because one of the reasons – one of the things I usually say during the course of the voir dire, or at some time or another during the course of the case, there is nothing magic about this process that we are involved in. The idea is that people come and tell you what they know. People don't come in and tell you what someone else knows. They tell you what they know.

And so the question that I got in this case from one of you is this question: "Hearsay. Why do some witnesses get to tell the Court what someone else said, like tellers can say what another teller said, but some witnesses can't say what another person says, like the defendant couldn't say what his brother said?"

Now, under the general rubric, the general statement, hearsay—under the word "hearsay" there are a lot of things that can happen. But, as I said, we generally want someone to come in and tell what they know and not what someone else told them. That is generally what we are talking about.

The classic definition in the rule book is that hearsay is a statement other than one made by the declarant; that is, other than one made by the witness, while testifying at the trial or hearing offered to prove the truth of the matter asserted.

And the best example of that is if you have got two kids and one of them, you don't know which one, took the peanut butter out of your kitchen and you have got the two kids standing there and the one kid said,

"Well, he took it." Can you rely on that as a trustworthy statement? No.

And the whole notion about hearsay is trustworthiness. That is, we get what the person knew, not what someone else who isn't going to appear knows. It is what that person knows. Those are the general topics.

Specifically in this case we heard from tellers. We heard from tellers telling what each one of them said. But we also heard from the other teller. So we have that trustworthiness.

And it is still up to you to decide what happens. But it is admissible so that you can consider it. And it is thought to be trustworthy enough for you to consider because we heard from those people.

Now, the nature of their conversation is different too. We don't want something that someone else said outside of the courtroom and that the witness would testify to offer for the truth or falsity of it, such as he stole – he took the peanut butter. That we don't want.

Now, it is all right for someone to say, "Joe told me to go to Cleveland. That is why I went to Cleveland." That really is a statement outside, but it is not offered for the truth of anything other than the guy said you should go to Cleveland.

There are 18 listed exceptions to the hearsay rule, and I have to know those and they have to know those. And we do our best to apply those. And we do it – I do it from almost 29 years of experience as being a trial judge and doing it. That is how I do it.

So I could see - and sometimes I'll stop in the middle of that because I can see the jurors will be wondering why in the world would you allow this in and you don't allow that in. So it is a perfectly good question. Nothing wrong with asking this question, particularly in this case when some hearsay objections have been sustained and some have been overruled. Perfectly alright for you to wonder about that.

So does that clear it up for you? Do you understand that any better, you think?

Then the other question is, are you so concerned about hearsay and the Court's ruling on it and the way we have handled it in this case that you think the trial is unfair? Anybody feel that way?

No.

Everybody okay to continue?

Tr.IV at 488-91.

Immediately after the judge finished his discussion of hearsay, defense counsel requested a sidebar. He submitted that the judge, in his discussion of hearsay, improperly had expressed his opinion regarding the credibility and trustworthiness of the witnesses at trial. Even more problematic, counsel suggested, was the judge's example of the quintessential untrustworthy hearsay testimony: Two brothers standing in the kitchen, each accusing the other of stealing the peanut butter. This example, he noted, was dangerously close to Mr. Curry's own defense at trial—that his brother had robbed the bank, not him.

Defense counsel then moved for a mistrial. The district court acknowledged the problem, stating: "That is the last thing I wanted to do. I hope I didn't really do that." Tr.IV at 492. After considering the defendant's argument, however, the court responded: "It is a reasonable request. I'm going to deny it." *Id*. Instead, the court decided to give the jury a limiting instruction. Accordingly, upon their return to open court, the district court remarked:

> [A]ny comment that I make or anything that I say is not designed to tell you how to come out in this case. I'm telling you how hearsay works as best I can to answer your question. I'm not telling you who to believe and who to disbelieve in this case. The fact that it comes in just means it has reached a relative standard and doesn't mean that you have to do one thing or another. You understand that?

> This is your decision and not mine, and you are to decide who is credible and who isn't. I don't tell you who is credible and who isn't, but you decide what is credible and what isn't from what you hear and from whatever evidence is allowed in this case. There is a relative standard of trustworthiness that must be met before you hear it, but you are the ultimate decider on what is and what isn't and how the case comes out. You see that?

> I'm a little concerned that you think I think this case ought to come out one way or another, and I don't. Does anybody feel I have said that or thought that in this case?

I see all these no's.

Then I think we are ready to proceed, counsel.

Tr.IV at 493. Counsel then made their closing arguments, instructions were given, and the case was submitted to the jury. On March 8, 2007, the jury returned a verdict, finding Mr. Curry guilty on all counts. On June 8, the court sentenced Mr. Curry to 1,071 months' imprisonment, five years of supervised release and restitution in the amount of $1,052,337.65. Mr. Curry timely appealed his conviction.

## II

## DISCUSSION

### A.

We review for abuse of discretion the district court's decision to answer a question from the jury, as well as the language used in its response. *United States v. Hewlett*, 453 F.3d 876, 880 (7th Cir. 2006); *United States v. Young*, 316 F.3d 649, 661 (7th Cir. 2002). Additionally, because the trial court "is in the best position to determine the seriousness of the incident in question, particularly as it relates to what has transpired in the course of the trial," we review the court's denial of a motion for mistrial for an abuse of discretion. *United States v. Danford*, 435 F.3d 682, 686 (7th Cir. 2006). The district court has substantial discretion over whether to issue a curative instruction, rather than grant a mistrial, so long as the curative instruction adequately addresses the issue raised. *United States v. Martin*, 189 F.3d 547, 555 (7th Cir. 1999); *United States v. Lomeli*, 76

F.3d 146, 149 (7th Cir. 1996). The ultimate inquiry is whether the defendant was deprived of a fair trial. *Danford*, 435 F.3d at 686.

We have cautioned that "trial judges wield substantial influence over juries," and that a judge should take special care not to indicate his beliefs about a witness' honesty, "especially when a criminal defendant testifies on his own behalf." *Martin*, 189 F.3d at 553. Mr. Curry contends that the district court's statements regarding hearsay reasonably could have been interpreted by the jury as a comment on the trustworthiness of the witnesses and/or the credibility of the defense. Accordingly, Mr. Curry submits, the trial judge's statements regarding hearsay improperly influenced the jury and deprived him of a fair trial. *See United States v. Verser*, 916 F.2d 1268, 1272-73 (7th Cir. 1990) (noting that the court's duty to avoid giving an "impression to the jury that the judge believes one version of the evidence and disbelieves or doubts another" is "[f]undamental to the right to a fair trial"). We evaluate this claim using a two-part inquiry: (1) "whether the judge in fact conveyed a bias regarding the defendant's dishonesty or guilt"; and (2) "whether the complaining party has shown serious prejudice resulting from the district court's comments or questions." *United States v. McCray*, 437 F.3d 639, 643 (7th Cir. 2006); *see also Martin*, 189 F.3d at 553.

We address first whether the district court's comments regarding hearsay in fact conveyed a bias against the defendant. During Mr. Curry's testimony, the district court sustained a number of the Government's hearsay

objections, apparently precipitating the juror's question regarding hearsay. In response to the juror's question, the court gave an explanation of hearsay that was lengthy, confusing and, at times, incorrect.[1] Mr. Curry submits that the court's explanation served only to suggest that Mr. Curry had been barred from testifying about his conversations with his brother because that type of testimony was not "trustworthy." *See* Tr.IV at 489-91 (using some iteration of the word "trustworthy" six different times).

Even more damaging, Mr. Curry contends, was the judge's primary example of inadmissible hearsay, in which one child accused of stealing peanut butter from his mother's kitchen denied responsibility and implicated his sibling instead. Mr. Curry contends that the court's statement could be construed as a suggestion that the "he did it, not me" defense is the utmost example of an untrustworthy statement—and, therefore, it is barred by the hearsay rules. Unfortunately, however, "he did it, not me" also happened to be quite similar to Mr. Curry's defense.

---

[1] In an effort to illustrate hearsay testimony, the district court provided the following hypothetical example: "And the best example of [hearsay] is if you have got two kids and one of them, you don't know which one, took the peanut butter out of your kitchen and you have got the two kids standing there and the one kid said, 'Well, he took it.' Can you rely on that as a trustworthy statement? No." Tr.IV at 489. This example is not, in fact, illustrative of hearsay. The child in this example was not testifying about an out of "court" statement; he merely asserted directly to the "court" his belief that his brother, not him, had stolen the peanut butter. *See* Fed. R. Evid. 801(c) (defining hearsay).

The Government does not dispute that the district court's statements reasonably could be interpreted as a statement against the credibility of the defendant. Instead, it contends that the district court properly exercised its substantial discretion in deciding not to grant the defendant's motion for a mistrial. The Government emphasizes that, immediately after answering the juror's question, the district court gave a lengthy limiting instruction in which it explained that it was not expressing a view on the credibility of the defendant or the defense. *See* Tr.IV at 493 (noting that the jury is the sole arbiter of facts and that the court did not intend to express an opinion on the credibility of the witnesses in its discussion of hearsay). Additionally, the Government notes, the court advised the jury on numerous occasions that the jury is the sole arbiter of credibility and that it should not be influenced by statements from the court or from attorneys. *See* R.42 at 2 (the jury should not be influenced by objections of counsel); R.42 at 4 (the jury is the sole judge of the credibility of witnesses); R.42 at 29 (neither by the instructions nor by any other remark did the court mean to express any opinion as to the facts or the verdict that should be reached).

As we often have noted, the district court is in the best position to evaluate the effect that an error may have on the overall course of the proceedings, as well as whether a limiting instruction can cure any potential prejudice. *Danford*, 435 F.3d at 686. Accordingly, trial judges have broad discretion in deciding to give a cautionary instruction rather than to declare a mistrial. *Id.*; *Martin*, 189 F.3d at 555. This court repeatedly has held that "jurors are

presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *Danford*, 435 F.3d at 687 (internal quotation marks omitted); *see also McCray*, 437 F.3d at 644 (finding that a similar instruction reduced the risk of prejudice from the court's decision to question witnesses itself); *Martin*, 189 F.3d at 555 (same).

Although we think that it is a close question, we do not believe that this is the type of situation in which a curative instruction would be so ineffective that the failure to declare a mistrial would be an abuse of discretion. "The district court's comments must be evaluated in the context of the course of the trial," *Verser*, 916 F.2d at 1273, and the judge's behavior throughout trial showed no hint of bias. His comments were inadvertent, isolated and ambiguous. *See id*. Furthermore, the district judge, later recognizing the potential for his statement to be misinterpreted, offered numerous detailed cautionary instructions to the jury in order to avoid any ambiguity. *See United States v. Peters*, 791 F.2d 1270, 1286 (7th Cir. 1986) (noting that "the trial judge's comments to the jury were ill-advised . . . at best vague, unclear, and possibly confusing for the jury," but ultimately concluding that "any confusion caused by the comments was cured by the court's customary and complete final instructions to the jury about its role and about the law") (superceded on other grounds, as stated in *United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990)). The district judge, unlike us, was present to observe the jury's reaction; he therefore was in the best position to judge the effect that his comments had on the jury. We

cannot say here that his decision not to declare a mistrial was an abuse of discretion.[2]

### B.

Mr. Curry next contends that the search warrants issued in this case were not supported by probable cause and that the evidence recovered in the search undertaken on the authority of the warrants therefore must be suppressed. "On the mixed question whether the facts add up to probable cause, we give no weight to the district judge's decision," however, we give "'great deference' to the conclusion of the judge who initially issued the warrant." *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008) (quoting *United States v. McIntire*, 516 F.3d 576, 578 (7th Cir. 2008)). When reviewing an issuing judge's initial probable cause determination, we defer to his initial

---

[2] Alternatively, the Government contends that we should not reverse the conviction here because any error in this case was harmless given the overwhelming evidence of Mr. Curry's guilt. In considering whether an error was harmless, we have noted that "[t]he central question is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Williams*, 493 F.3d 763 (7th Cir. 2007) (internal quotations omitted). If an error clearly did not affect the jury's decision, we shall not reverse a conviction. The Government asserts that such is the case here. Because we conclude that the court did not err in denying Mr. Curry's motion for a mistrial, we need not address the Government's harmless error contention.

determination if there is "substantial evidence in the record" that supports his decision. *United States v. Koerth*, 312 F.3d 862, 865 (7th Cir. 2002). "[T]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 866 (quotation marks omitted).

"A search warrant affidavit establishes probable cause when, based on the totality of the circumstances, it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005) (internal quotation marks omitted). The Government need not provide direct evidence that fruits of the crime or other evidence will be found in the location specified: The magistrate judge "is entitled to draw reasonable inferences about where evidence is likely to be kept," and he "need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Sleet*, 54 F.3d 303, 306 (7th Cir. 1995) (quotation marks omitted). Nevertheless, the judge may not rely solely upon "conclusory allegations" or a "'bare bones' affidavit" when issuing a warrant. *Koerth*, 312 F.3d at 867.

On February 10, 2006, FBI Special Agent Joseph D. Rock presented an application for a search warrant to a magistrate judge in the Southern District of Indiana, requesting a warrant to search Mr. Curry's residence and a warrant to search his storage locker. The application was supported

by an affidavit that noted, inter alia, that: (1) witnesses to the crime had given descriptions of the robbers consistent with Mr. Curry's appearance; (2) the tellers in at least one robbery had given the subjects red dye packs, which they had seen explode as the individuals fled the scene; (3) Mr. Curry had been observed on numerous occasions passing or attempting to pass large amounts of currency stained with red dye at other banks and at casinos; (4) the red dye on the cash spent by Mr. Curry and collected by banks and a casino was consistent with the dye emitted by dye packs during bank robberies; (5) a car used in connection with one of the robberies had been reported stolen in Crawfordsville, Indiana, and Mr. Curry had checked out of a motel room there the morning of the theft; (6) Mr. Curry was observed going to a storage facility where he had access to a storage unit rented in his name; (7) while at the storage facility, he was seen taking a box from the storage unit and putting it in his truck; (8) on another occasion, Mr. Curry was observed leaving his home and going to the storage unit, where he retrieved two large boxes, and later taking the boxes into his residence; and (9) Mr. Curry was observed placing items in a trash dumpster, where law enforcement officers later discovered a black trash bag covered in a red dye consistent with the dye in the bank's dye packs.

From these and other details outlined in a 15-page affidavit, the magistrate judge concluded that the Government had probable cause to believe that Mr. Curry was involved in the robberies and that officers were reasonably likely to recover evidence or fruits of the crime in his residence or storage locker. Accordingly, he issued war-

rants to search the residence and storage unit for the items outlined in the affidavit. We agree with the issuing judge that the evidence presented in the affidavit clearly supported a determination of probable cause.

Moreover, even if the search warrants had not been supported by probable cause, the evidence recovered in the subsequent searches is not necessarily subject to suppression. *Sleet*, 54 F.3d at 307. Evidence collected pursuant to a facially valid search warrant issued by a neutral, detached magistrate is nevertheless admissible if the officers relied on the warrant in good faith. *Mykytiuk*, 402 F.3d at 777. An officer's decision to obtain a warrant is *prima facie* evidence that he acted in good faith. *Id.*; *Koerth*, 312 F.3d at 868. Mr. Curry can rebut this presumption of good faith "only by showing that the issuing judge abandoned his role as a neutral and detached arbiter, that the officers were dishonest or reckless in preparing the supporting affidavit, or that the affidavit was so lacking in probable cause that no officer could have relied on it." *Mykytiuk*, 402 F.3d at 777; *see also Koerth*, 312 F.3d at 868.

Mr. Curry does not suggest that the issuing judge abandoned his judicial role; nor does he suggest that the FBI acted with recklessness or dishonesty in preparing the affidavit. Therefore, he must show that the affidavit was so lacking in probable cause that no reasonable officer could have relied on the warrants in executing a search. However, "in the ordinary case, a law enforcement officer 'cannot be expected to question' the magistrate's probable cause determination." *Sleet*, 54 F.3d at 307 (quoting *Illinois v. Krull*, 480 U.S. 340, 349 (1987)). The officers here would

have had no reason to question the warrants because, as we have described, the affidavit referred to significant circumstantial evidence that indicated that Mr. Curry may have been the perpetrator of the robberies under investigation, and that the fruits and instrumentalities of that robbery may be located in his home or in his storage locker. The officers relied on the warrants and executed the search in good faith; therefore, the district court did not err in refusing to grant Mr. Curry's motion to suppress. *See United States v. Dickerson*, 975 F.2d 1245, 1250 (7th Cir. 1992).

## C.

In its final instructions to the jury, the district court included a statement regarding a defendant's liability for aiding and abetting a crime. The court used the Seventh Circuit pattern jury instruction for aiding and abetting,[3] which states:

> Any person who knowingly aids, counsels, commands, induces, procures, or authorizes the commission of an offense may be found guilty of that offense. That person must knowingly associate with the criminal activity, participate in the activity, and try to make it succeed.
>
> If a defendant knowingly caused the acts of another, the defendant is responsible for those acts as though he personally committed them.

---

[3] Fed. Crim. Jury Instruction of the Seventh Cir., Instruction No. 5.06, at 78 (West 1999).

R.42, Instruction 20. Mr. Curry objected to the instruction in conference, contending that the record did not support an aiding and abetting instruction. Tr.III at 470. The Government submitted that the instruction was necessary because "there could be an argument about whether or not both people were armed in all the robberies." Tr.III at 470-71. The district court overruled the objection, noting that it was an accurate statement of the law and informing defense counsel that, if he was worried about a potential misapprehension caused by the instruction, he could explain it to the jury in his closing statements. Tr.III at 471. Defense counsel declined to do so.

On appeal, Mr. Curry contends that the jury instruction was incomplete and therefore misleading. In his view, the jury may have convicted him of aiding and abetting the crime, based solely on evidence that he allowed his brother Arthur the use of his storage locker and attempted to exchange some of the red-stained money after the commission of the crime. Such actions, however, would not support a conviction under 18 U.S.C. § 2133 or 18 U.S.C. § 924(c). *See Woods*, 148 F.3d at 849.

Our review of jury instructions is limited. *Woods*, 148 F.3d at 849. "We seek only to determine if the instructions as a whole were sufficient to inform the jury correctly of the applicable law." *Id*. "If the instructions are adequately supported by the record and are fair and accurate summaries of the law, the instructions will not be disturbed on appeal." *United States v. Lanzotti*, 205 F.3d 951, 956 (7th Cir. 2000). We reverse a conviction only if it appears both that the jury was misled and that the instructions prejudiced the defendant. *Woods*, 148 F.3d at 849.

Mr. Curry does not contend that the instruction given was inaccurate; he merely suggests that it was incomplete. In his view, the jury could have convicted him based on a misapprehension that his efforts to conceal the crime after-the-fact constituted "aiding and abetting." To be convicted of aiding and abetting, however, a violation of either 18 U.S.C. § 2133 or 18 U.S.C. § 924(c), a defendant must have facilitated or encouraged the underlying crime, not merely the subsequent cover-up. *See Woods*, 148 F.3d at 848. Because the jury was not specifically informed of this rule, he contends, there is a chance that the jury improperly convicted him based on his post-crime actions alone.

The jury instruction, however, was a correct statement of the law. As the Government explains in its brief, the instruction also was necessary because it was unclear to some of the witness bank tellers whether both robbers had been armed. Therefore, a jury may have concluded that there was insufficient evidence that Mr. Curry had brandished a firearm during each robbery. Whether or not Mr. Curry himself brandished a firearm, however, he certainly facilitated the use of the firearm by participating in the robbery and "mak[ing] it easier for another to carry a firearm through division of labor." *Woods*, 148 F.3d at 848. Accordingly, the district court did not err when it concluded that the aiding and abetting instruction was necessary to prevent acquittal on this ground.

If defense counsel was concerned about a potential misapprehension regarding the law of aiding and abetting, he had the opportunity to propose additional instructions or to provide the jury with additional information in his

closing remarks. Despite the district court's invitation, however, he declined to do so. Accordingly, we must conclude that the jury instructions given in this case did not mislead the jury or prejudice the defendant.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED