In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 20-1036

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ADONNIS CARSWELL,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:17-cr-00039-HAB-SLC-1 — **Holly A. Brady**, *Judge*.

---

ARGUED FEBRUARY 12, 2021 — DECIDED MAY 6, 2021

---

Before RIPPLE, HAMILTON, and ST. EVE, *Circuit Judges*.

HAMILTON, *Circuit Judge*. A jury convicted defendant-appellant Adonnis Carswell on four drug and firearm offenses, including possession of heroin with intent to distribute. 21 U.S.C. § 841(a)(1). He raises two issues on appeal. First, he contends that the search warrant for his residence was issued without probable cause, so that the heroin, cash, and firearms

found there should have been suppressed as evidence. Second, he contends that several portions of the prosecutor's closing arguments violated his constitutional rights.

We affirm. The judge who issued the search warrant had a reasonable basis for thinking evidence of drug and firearm crimes was likely to be found at Carswell's home. The prosecution's closing arguments were not improper, did not make Carswell's trial unfair, and did not deny him due process of law. We address first the search warrant issue and then the closing arguments. Key to both issues is Carswell's trial defense, which was that the 64 grams of heroin seized in the search of his home was only for his personal use and that he was not distributing drugs of any sort.

I.   *Probable Cause for the Search Warrant*

   A.  *Facts and Procedural Background*

In June 2017, Officer Caleb Anderson with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) sought a federal warrant to search for evidence of drug trafficking and unlawful possession of a firearm in the New Haven, Indiana residence of defendant Adonnis Carswell and his partner, Dereka Evans. To establish probable cause, Officer Anderson's supporting affidavit relied on three sources of information: a trash pull from Carswell's driveway that turned up evidence of drugs, drug packaging materials, and a firearm purchase; Carswell's prior drug-related activity; and a tip from a recently arrested drug dealer who identified Carswell as his/her supplier. Even if we assume for purposes of the appeal that none of these three sources alone would have pro-

vided probable cause, we must consider them together. Together they gave the issuing judge probable cause to issue the warrant.

The story begins on June 26, 2017, when police saw Carswell driving a Porsche over 100 miles per hour through a 45 miles per hour zone of New Haven, Indiana. When police stopped him, he gave his home address on Green Road in New Haven. Law enforcement had suspected Carswell of drug dealing but had not yet figured out where he lived. After Officer Anderson learned of Carswell's arrest, he carried out surveillance at the Green Road address for four days. He consistently observed a vehicle registered to Carswell parked in the driveway.

On the first evening of surveillance, Officer Anderson noticed two trash bins at the end of the driveway for pick-up. He returned just before midnight and removed several bags from the bins. He found the following items in one of the trash bags: (i) three opened food-saver bags; (ii) two one-gallon Ziploc bags containing residue that field-tested positive for cocaine; (iii) two sandwich bags that field-tested positive for cocaine; (iv) two pairs of white latex gloves; and (v) packaging that resembled a kilogram wrapper for cocaine that field-tested positive for cocaine. The kilogram packaging, which Officer Anderson identified as green saran wrap, matched photographs of drug packaging used in a 2014 Indiana State Police case involving Carswell. Officer Anderson's affidavit also said that green saran wrap is commonly used to wrap kilogram packages of cocaine. A kilogram typically costs between $25,000 and $35,000 and is not (remotely) a user quantity.

In a second trash bag, Officer Anderson found three grams of a pink crystal substance that he recognized as crystal methamphetamine and that later field-tested positive for methamphetamine. His affidavit said that a personal user of methamphetamine was unlikely to discard three grams of the drug (valued at approximately $300).

Officer Anderson also found receipts showing that Ms. Evans had purchased a CZ Scorpion EVO 3 pistol and four boxes of ammunition from a Fort Wayne firearms dealer in April 2017. Officer Anderson explained that in his training and experience, it was common for people with prior felony convictions to have close associates, including girlfriends, buy firearms for them.

Officer Anderson's affidavit also provided background information on Carswell and Evans. Carswell had a 2004 felony conviction for armed bank robbery. The affidavit described a recent Indiana State Police investigation involving intercepted shipments of marijuana to Fort Wayne addresses associated with Carswell. In March 2015, officers identified a five-pound package of marijuana on its way to one of those addresses, located on Stormy Court. Officers had obtained a warrant and made a controlled delivery. When Carswell, Evans, and two children arrived, Carswell took the package inside. When the package was opened, officers executed their search warrant. They found the bundle of marijuana encased in green saran wrap, as well as $7,240 in cash, a Glock .40 caliber pistol, a ballistic body-armor vest, documents and mail in Evans' name, documents and mail in Carswell's name, three drug ledgers, several cell phones belonging to Carswell, a digital scale with cocaine residue, a plate with cocaine residue,

plastic bags, and rubber gloves. Carswell was eventually convicted in Indiana state court of maintaining a common nuisance.

Finally, Officer Anderson's affidavit reported May 2017 statements by a person arrested for unlawful possession of a firearm. The arrestee's residence contained evidence of drug trafficking, including $3,000 in cash, a firearm near materials used to dilute cocaine and heroin, 386 grams of marijuana, 24 grams of crack cocaine, 58 grams of heroin, and 6 grams of fentanyl. The arrestee told Officer Anderson that he/she earned about $20,000 per month by dealing drugs. The person identified Carswell and Carswell's brother, Jashod Thomas, as the suppliers. The arrestee claimed that Thomas had supplied cocaine, crack cocaine, and heroin two days prior to the arrest. The arrestee further claimed that Thomas had been supplied by Carswell.[1]

A federal magistrate judge issued a warrant to search Carswell's Green Road residence based solely on Officer Anderson's affidavit. Officers confiscated 64 grams of heroin, five cell phones, $25,000 in cash, firearms and ammunition, and drug packaging materials, including two digital scales that field-tested positive for cocaine and a machete laced with marijuana residue. Carswell was charged with federal drug and firearm offenses.

Carswell moved to suppress all evidence seized in the search of his residence, asserting that the warrant failed to establish probable cause. The district court denied the motion,

---

[1] The arrestee had provided addresses for Carswell, but Officer Anderson had been unable to locate Carswell at those addresses. The arrestee had not provided the Green Road address.

finding that Officer Anderson's affidavit established a fair probability that a search of Carswell's residence would reveal evidence of drug trafficking and unlawful possession of a firearm. The court did not reach the government's back-up argument that the evidence should not be suppressed because officers relied in good faith on a facially valid warrant, per *United States v. Leon*, 468 U.S. 897, 922 (1984).

B.  *Analysis*

The Fourth Amendment provides "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation …." Probable cause for a search warrant is established when, based on the totality of the circumstances, the government presents a judge with evidence showing a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Jones*, 208 F.3d 603, 608 (7th Cir. 2000). On appeal we give no special weight to the district court's legal conclusion about probable cause, but we defer to the issuing judge's decision so long as substantial evidence supported it. *United States v. Curry*, 538 F.3d 718, 729 (7th Cir. 2008). When an affidavit is the only evidence presented to support a search warrant, the validity of the warrant rests solely on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009).

The task of the issuing judge is to make a "practical, commonsense decision" whether, in light of the facts in the affidavit, there is a fair probability that contraband or evidence of a crime will be discovered in a particular place. *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002), quoting *Gates*, 462 U.S. at 238; accord, e.g., *United States v. Aljabari*, 626 F.3d 940, 944

(7th Cir. 2010) (this is a "common-sense, non-technical determination"). The judge is entitled to draw reasonable inferences about where evidence is likely to be kept and must conclude only that it would be reasonable to seek the evidence in the location identified in the affidavit. *Curry*, 538 F.3d at 729. Nevertheless, a judge may not rely solely upon "conclusory allegations" or a "bare bones" affidavit in issuing a warrant. *Id.*, quoting *Koerth*, 312 F.3d at 867.

Here, the issuing judge reasonably found a fair probability that evidence of drug and firearm crimes would be found at Carswell's Green Road residence. On appeal, Carswell challenges each of the three legs of the stool that Officer Anderson and the issuing judge used to support probable cause.

The trash pull found drugs, drug residue, drug packaging materials, and a receipt for a firearm and ammunition, providing substantial reason to think one might find drug-distribution and firearm evidence in the Carswell residence. See *United States v. McDuffy*, 636 F.3d 361, 364 (7th Cir. 2011) ("[E]ven a tiny bit of discarded drugs increases the likelihood that police will find more in the home."); *United States v. Billian*, 600 F.3d 791, 794 (7th Cir. 2010) (small quantities of marijuana in defendant's trash indicated that there was marijuana in his house, not that small quantities were all he possessed).

Carswell points out that two trash pulls with drug evidence would be more compelling than just one because of the possibility that someone else could have dropped her trash in the bins at the end of his driveway. Cf. *United States v. Leonard*, 884 F.3d 730, 734–35 (7th Cir. 2018) (two trash pulls, a week apart, both testing positive for cannabis, were sufficient to establish probable cause for search warrant). We suppose it is

possible that other people dropped their drug-related trash in Carswell's bins that particular week. But that possibility does not necessarily defeat probable cause, which deals with, well, probability, not certainty. See *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006) ("theoretically possible" scenario submitted by defendant was not enough to negate existence of probable cause). (Not to mention the receipt for Evans' purchase of the CZ Scorpion pistol and ammunition, and the ample evidence linking Carswell and Evans to the Green Road residence.)[2]

In addition to the drug and firearm evidence from the trash pull, the affidavit noted Carswell's criminal history, including the armed robbery and the nuisance conviction from the receipt of distribution quantities of marijuana. Such prior convictions will not by themselves establish probable cause for a search today, of course. (Recall Captain Renault's iconic line at the end of *Casablanca*, "Round up the usual suspects ….") But those prior convictions can be relevant and "retain some corroborative value." *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005); see also *McDuffy*, 636 F.3d at 364 (prior drug convictions not dispositive but relevant and entitled to some weight in casting doubt on any innocent explanations for the marijuana trace in trash, a currency handoff, and a stream of visitors to suspect's home); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (interpreting evidence from suspect's trash in light of prior conviction).

---

[2] The affidavit also connected Evans to Carswell. For example, in 2014 and 2015, Evans and Carswell shared the Stormy Court residence where Carswell received the marijuana bundle. And on June 26, 2017, Evans picked up Carswell when his Porsche was impounded after his speeding offense.

Carswell also points out that the informant's tip lacked detail and that no information was provided about the informant's reliability or basis of knowledge. We assume that the informant's tip would not have been enough by itself to support a search warrant. See, e.g., *Olson*, 408 F.3d at 370 (newly arrested informant "merits a greater dose of skepticism when assessing his credibility"); *United States v. Peck*, 317 F.3d 754, 757 (7th Cir. 2003) ("Given the deficiencies in the warrant application, we cannot find that [the confidential informant's] oath compensates for the lack of detail in the affidavit and the failure of the police to corroborate her statements."). That's why we ordinarily expect police officers to corroborate information from tipsters of unknown reliability. See *McDuffy*, 636 F.3d at 364 (informant's report was "firsthand and precise, and thus more reliable"); *Olson*, 408 F.3d at 371–72 (emphasizing that some corroboration of informant's account was essential to uphold warrant); *Jones*, 208 F.3d at 609 ("Officer Welsh corroborated as much of Jane Doe's information as he could before seeking the search warrant."); *United States v. Singleton*, 125 F.3d 1097, 1104 (7th Cir. 1997) (highlighting "independent, often contemporaneous, police corroboration" of informant's controlled buys).

Here the investigators had substantial corroboration, which poses the biggest obstacle for Carswell's challenge to the search warrant. When we evaluate a probable cause finding, we do not view the individual facts in isolation. We consider the totality of the circumstances presented to the judge. *United States v. Fifer*, 863 F.3d 759, 764 (7th Cir. 2017). The determination is rooted in common sense. It requires only a fair probability—not certainty—that the search will uncover evidence of criminal activity. *Gates*, 462 U.S. at 238 & 243 n.13;

*Curry*, 538 F.3d at 729; *Koerth*, 312 F.3d at 866. The combination of the drug and firearm evidence from the trash pull, Carswell's prior convictions, and the informant's tip was enough to support, even if not to require, a finding of probable cause for the search warrant. We need not address the officers' good-faith reliance on the warrant. The district court properly denied Carswell's motion to suppress the evidence seized pursuant to the search warrant.

II.  *Closing Arguments and the Claims of Prosecutorial Misconduct*

    A.  *Facts and Procedural Background*

        1.  *The Search of Carswell's Green Road Residence*

To explain Carswell's numerous challenges to the closing arguments, we need to lay out much of the evidence presented at trial. When federal agents executed the search warrant, they found extensive evidence of drugs and firearms. Carswell's only defense at trial was that the 64 grams of heroin found in the search was only for his personal use, not for distribution.

In the master bedroom, agents found two firearms, ammunition, five cell phones, and thousands of dollars in cash. The CZ Scorpion EVO 3 pistol—listed on the receipt from the trash pull—was under the bed, loaded with twenty-one rounds in the magazine and one in the chamber. In the dresser, officers found a purse with Evans' identification and handgun permit.

In the master bedroom closet, and close to Carswell's wallet, officers found a Zastava AK-47 Variant rifle loaded with 60 rounds of ammunition. Also close to the rifle, officers found men's clothing, a Rolex watch, and a digital safe. From inside the safe, officers recovered $3,000 in cash. A second safe

held $20,404 in cash banded into sets of thousands. Agents re-covered a total of $25,464 in cash.

In the kitchen, agents found a Smith & Wesson pistol loaded with ten rounds, including one in the chamber. A cab-inet held extra magazines for the Smith & Wesson and CZ Scorpion pistols, a box of ammunition, and, most notably, 64 grams of heroin. Agents also found two digital scales that rec-orded weights up to 13 pounds and later field-tested positive for cocaine. The basement smelled of raw marijuana, and agents found green plastic saran wrap and a machete laced with marijuana residue.[3]

Agents examined photographs and text messages from Carswell's cell phones. One photo showed a partial brick of cocaine next to three individual portions atop a scale. The scale read "64," which ATF Agent Thomas Kaiser interpreted to mean 64 ounces or four pounds of cocaine. The counter and the scale in the photo matched the counter and one of the dig-ital scales found in Carswell's kitchen. Another photo showed 44 pounds of marijuana bundled into three large bales atop a floor scale.

2. *Carswell's Statements During the Search*

During the search, Carswell was taken to his dining room. He volunteered to Agent Kaiser: "It's all personal."[4] Carswell

---

[3] A government witness testified that machetes are commonly used to break apart bales of marijuana.

[4] Carswell's out-of-court statement was offered by the government. On direct examination, Agent Kaiser testified that Carswell briefly en-gaged him in a conversation about sports. The conversation quickly piv-oted to the possibility of finding narcotics in Carswell's home. Agent Kai-ser testified that "from what I could gather," Carswell told him: "Just put

was later interviewed by Officer Anderson and ATF Agent Sean Skender. Officer Anderson and Agent Skender asked Carswell if he had used drugs within the last twenty-four hours. Carswell replied "marijuana" and clarified that he had used the drug a "few times" the day before. Carswell later admitted that there was heroin in the kitchen cabinet and claimed that he used heroin but was not addicted to it. During the interview, Carswell wore boxer shorts and a sleeveless undershirt. Agents did not observe track marks on his arms and legs or any other physical signs of heroin use.

### 3. *Trial Evidence*

Carswell did not testify or offer other evidence, but his counsel used cross-examination to lay a foundation for his personal-use defense theory. Defense counsel confirmed that Carswell had told the agents during the search that the heroin in the kitchen was "for personal use." As another example, one agent acknowledged that heroin can be consumed nasally—i.e., snorted—through a rolled-up dollar bill, for example, without needles or evidence of smoking.

To rebut Carswell's personal-use theory, the government called a veteran DEA agent, Howard Schneider, Jr., as an expert witness in drug trafficking. Agent Schneider testified that heroin is very addictive, both emotionally and physically. It is common, he said, for heroin users to consume the drug every day. It is also common for those who stop using heroin to become "dope sick," causing them to sweat, vomit, and suffer flu-like symptoms. Agent Schneider testified that if a heroin

---

it in your pocket, $10,000." Agent Kaiser testified that he responded: "Are you referring to narcotics?" Carswell replied, "It's all personal."

user had not used heroin within the past twenty-four hours, he would expect the person to be "dope sick."

Agent Schneider also testified that heroin users typically smoke or inject the drug. He testified that heroin users who snort the drug tend to have straws or thin glass tubes, while those who inject the drug have a "kit" consisting of a needle, spoon, belt (or tourniquet) to prepare the veins, and a pocket scale that can measure the tenths of grams that constitute the typical single dose.[5] To that point, Agent Schneider added, the digital scales found in Carswell's kitchen—which recorded weights up to 13 pounds—were not typical user scales.

Agent Schneider also testified that in his experience, users possess "very small amounts" of heroin. The largest quantity that a user will possess, he explained, would be an "eight ball," about three grams. Agent Schneider explained that a lack of self-control combined with a desire to avoid withdrawal prevents the average heroin user from possessing large quantities of the drug at any given time. For similar reasons, he said, heroin users do not typically possess large sums of cash. Agent Schneider said he had never encountered a heroin user who possessed a month's supply, let alone a year's supply, of heroin. In his experience, therefore, 64 grams of heroin was "distribution quantity."[6]

---

[5] Agent Schneider testified that a typical single dose of heroin is 0.1 gram, but a heavy user might consume up to three grams in a single dose.

[6] On cross-examination, Agent Schneider conceded that heroin has a long shelf life, and that, as with many other products, it can be cheaper if bought in bulk. He also said that a person who snorts the drug typically will use a larger quantity in a single dose than a person who injects it. And

4. *Closing Arguments*

The government's closing arguments focused on the issue of intent to distribute versus personal use. The government emphasized Agent Schneider's opinions about the physical evidence seized from Carswell's home—firearms, ammunition, packaging for distribution, lots of cash, the quantity of heroin—and the absence of physical evidence of personal use, including the absence of evidence of dope sickness.

Carswell contends that several of the government's remarks violated his right to a fair trial under the due process clause of the Fifth Amendment. Carswell argues that the government: (i) directly and indirectly commented on his decision not to testify or present evidence at trial; (ii) argued that he was not "dope sick" without any basis in the record; (iii) argued that he operated a "stash house" with his brother without any basis in the record; and (iv) exaggerated the amount of heroin he possessed by misstating the evidence. Most of the challenged comments came in this passage:

> Consider the defendant's credibility. The only evidence the defendant has placed—don't get me wrong. He doesn't have to do anything if he doesn't want to. He doesn't have to testify or none of that. You are entitled to consider what evidence is in front of you through the exhibits and what's come in through the witness stand.

---

he acknowledged that heroin can be snorted from a surface without any special equipment.

So he did say that the heroin was personal use. But evaluate that credibility. What is the credibility of that statement? And the Judge is going to give you an instruction on credibility. And it talks about a couple of concepts that I think are important for you to consider. One of them is whether the defendant has a reason to lie. Is there any bias, prejudice or other reason to lie or slant the statement? The truthfulness and accuracy of the witness' statement—and this is the testimony instruction—but Mr. Carswell's statement in light of other evidence presented, and any inconsistent statements or conduct.

So consider that statement in light of the evidence. Does it make sense? With all this evidence of intent to distribute, that statement is just not a credible statement.

… His conduct is just simply not consistent with a user. He's not dope sick and he's got all those other tools of the drug trafficking trade: The fire power, the cash, the assets, the vehicles.

B. *Analysis*

In our view, none of the challenged remarks were improper, and none deprived Carswell of a fair trial. To evaluate such claims of prosecutorial misconduct, we first determine whether the remarks by the prosecutor were improper when viewed in isolation. *United States v. Common*, 818 F.3d 323, 331 (7th Cir. 2016). If not, the analysis ends there and the defendant's claim fails. *United States v. Love*, 336 F.3d 643, 647 (7th Cir. 2003). If any remarks were improper, we would evaluate

them in light of the entire record and determine whether they deprived the defendant of a fair trial. *Common*, 818 F.3d at 331. We would consider: (i) whether the prosecutor misstated the evidence; (ii) whether the remark implicated the specific rights of the accused; (iii) whether the defense invited the response; (iv) the effect of any curative instructions; (v) the defendant's opportunity to rebut; and (vi) the weight of the evidence. *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006); *Love*, 336 F.3d at 647–48. The weight of the evidence is by far the most important factor. *Love*, 336 F.3d at 648.

Defense counsel did not object to any of these remarks at trial. That means our review is even more deferential to the district court, limited to "plain error." *United States v. Tucker*, 714 F.3d 1006, 1011 (7th Cir. 2013). Under the plain-error standard, we determine whether there was: (i) an error (ii) that was plain, meaning, clear or obvious, (iii) that seriously affected Carswell's substantial rights to the extent that he probably would not have been convicted absent the error, and (iv) that seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.* Put another way, we ask whether the remarks were so egregious that the district judge was obliged, upon pain of reversal, to step in even without a defense objection. *United States v. Briseno*, 843 F.3d 264, 269 (7th Cir. 2016); *United States v. Alexander*, 741 F.3d 866, 870 (7th Cir. 2014).

### 1.  *Carswell's Decision Not to Testify at Trial*

Carswell argues that the government's argument improperly commented on his decision not to testify or present evidence at trial. The Fifth Amendment protects a defendant's right against compelled self-incrimination by permitting a de-

fendant to refuse to testify at trial. The corollary of that protection is that a prosecutor may not make comments, either directly or indirectly, that invite the jury to infer guilt from the defendant's decision not to testify. *Griffin v. California*, 380 U.S. 609, 615 (1965); *Tucker*, 714 F.3d at 1014. This important and general protection, however, does not silence the prosecution when the defense makes arguments not supported by credible evidence. The prosecution is well within its rights in pointing out the absence or weakness of defense evidence.

To preserve this balance, we have explained often that the Fifth Amendment may forbid a prosecutor's comment on the absence of a particular category of potential defense evidence when the *only* source of the potential evidence would have been the defendant himself. See *United States v. Cotnam*, 88 F.3d 487, 497 (7th Cir. 1996) (collecting cases explaining that the Fifth Amendment forbids prosecutorial comment on a failure to call witnesses when the only potential witness was the defendant himself); see also, e.g., *Tucker*, 714 F.3d at 1015 ("Although [defendant] did exercise his right not to testify, he was not the only witness capable of contradicting the Government's version of the facts."); cf. *United States v. Handman*, 447 F.2d 853, 855 (7th Cir. 1971) (reversing conviction where government commented on absence of evidence that could have come only from the defendant himself). Accord, e.g., *United States v. Williams*, 479 F.2d 1138, 1140 (4th Cir. 1973) (collecting cases from First, Second, Third, Fourth, and Tenth Circuits to support proposition that even after *Griffin*, "the prosecutor may point out that the defense did not offer evidence to contradict the government's case … at least where it is apparent that witnesses other than the defendant might have been offered by the defense"); *Desmond v. United States*, 345 F.2d 225, 227 (1st Cir. 1965) ("Nor can we doubt that the government's

statement that its witness' statement stood 'unimpeached and uncontradicted' constituted improper comment. No one but appellant (or his co-defendant, whom appellant could not put on the stand against his will) could have contradicted the government witness."); *United States v. Taylor*, 848 F.3d 476, 488–89 (1st Cir. 2017), citing *Desmond*, 345 F.2d at 227.

A prosecutor violates the Fifth Amendment by commenting directly and adversely on the defendant's failure to testify on his own behalf. *United States v. Hills*, 618 F.3d 619, 640 (7th Cir. 2010). Where a prosecutor indirectly comments on the defendant's failure to testify, such a comment will be deemed improper only if the prosecutor's "manifest intent" was to use the defendant's silence as evidence of guilt, or if the jury would "naturally and necessarily" infer guilt from the comment. *Id.*; *United States v. Mietus*, 237 F.3d 866, 871 (7th Cir. 2001).

Carswell challenges three comments on this ground. First, he points to the government's comment that he did not have to testify:

> Consider the defendant's credibility. The only evidence the defendant has placed—don't get me wrong. He doesn't have to do anything if he doesn't want to. He doesn't have to testify or none of that.

This comment closely tracked the trial court's correct and more formal instructions on the defendant's right not to testify. It was not improper at all.

The government continued: "You are entitled to consider what evidence is in front of you through the exhibits and what's come in through the witness stand." Carswell argues

that this statement, made in the context of discussing the credibility of his "It's all personal" statement to agents during the search, was an improper indirect reference to his decision not to testify. We do not see how the government can be faulted for this comment. It merely repeated the essence of the court's standard instructions about what counts as evidence. The defendant's statement that the 64 grams of heroin was for his personal use was in evidence. The government was entitled to respond by asking the jury to evaluate the credibility of that statement in light of all the evidence.

This is not a case where the only supporting evidence could have come from the defendant himself, so that a comment on the absence of supporting evidence might be interpreted as an indirect comment on his choice not to testify. Yes, Carswell could have testified himself about this. But he also could have offered evidence of paraphernalia indicating personal use, yet there was none. Or perhaps he could have offered evidence from his partner or friends who knew he used large quantities of heroin himself. Again, no such evidence was offered. The government was entitled to point out that the defendant's self-serving "personal use" statement was not credible because it was not supported by other evidence and was contradicted by a great deal of evidence. Those arguments did not violate the defendant's Fifth Amendment privilege. As noted above, pointing out the lack of witness testimony or exhibits supporting the defendant's theory does not violate the Fifth Amendment, at least so long as the defendant was not the only potential source of such evidence. Cf. *United States v. Lyon*, 397 F.2d 505, 509 (7th Cir. 1968) ("The commentary focused on the evidence as a whole and did not emphasize [defendant]'s failure to testify.").

Carswell also points to the government's comments on judging his credibility:

> So he did say that the heroin was personal use. But evaluate that credibility. What is the credibility of that statement? And the Judge is going to give you an instruction on credibility. And it talks about a couple of concepts that I think are important for you to consider. One of them is whether the defendant has a reason to lie. Is there any bias, prejudice or other reason to lie or slant the statement? The truthfulness and accuracy of the witness' statement—and this is the testimony instruction—but Mr. Carswell's statement in light of other evidence presented, and any inconsistent statements or conduct.

> So consider that statement in light of the evidence. Does it make sense? With all this evidence of intent to distribute, that statement is just not a credible statement.

Carswell argues that these comments misstated the instructions because the instructions applied only to witnesses and he did not testify. The jury, Carswell suggests, was likely confused by the government's instruction that it should evaluate his statements to officers during the search as though he had testified.

We disagree. First, juries often must evaluate the credibility of statements made outside of court. Consider the numerous exceptions to the general rule against hearsay. If an out-of-court statement is offered to prove the truth of the statement, the credibility of the statement is fair game. Although

Carswell's self-serving statement, that the 64 grams of heroin was for his personal use, was introduced by the government in this case, the statement served as the foundation for his entire theory of defense. The government was perfectly entitled to argue why that self-serving statement was not credible.

Moreover, the judge specifically instructed the jury about the defendant's statement in this case:

> You have heard testimony and received evidence that the Defendant made a statement to law enforcement officers. You must decide whether the Defendant actually made the statement and, if so, how much weight to give the statement. In making these decisions, you should consider all of the evidence, including the Defendant's personal characteristics and the circumstances under which the statement may have been made.

The government's comments fit right in with this instruction and did not comment indirectly on Carswell's decision not to testify.

### 2. *Carswell's Lack of "Dope Sickness"*

Carswell argues next that no evidence supported the government's argument that he was not "dope sick" while speaking with officers during the search, so that he could not have been a heroin user. We disagree. The combination of the agents' observations of Carswell and Agent Schneider's testimony about heroin users more generally was enough to support the point made in argument.

### 3. *The "Stash House" Comment*

During closing arguments, the prosecutor reviewed text messages from Carswell's cell phones, including one saying that Carswell had "people in Chicago that want 2, but they only pay 27, if that's cool. I'll make it happen?" The prosecutor also argued that one exchange between Carswell and an unidentified person indicated that Carswell's brother was operating a stash house connected to Carswell.[7] The prosecutor said in closing: "Sounds like little brother is operating a stash house that's connected to Mr. Carswell, because Mr. Carswell provides the phone so the other guy can take care of it." Carswell argues that this "stash house" comment went beyond the evidence. Counsel are allowed to comment on and argue inferences from the evidence. The "stash house" inference strikes us as a fairly long stretch, but there was no objection. This minor and tangential point did not deprive Carswell of a fair trial.

### 4. *Exaggeration of the Heroin Amount?*

Carswell complains that the government unfairly exaggerated the quantity of 64 grams of heroin by a mistaken analogy and by seeming to misquote defense counsel's argument. First, the prosecutor said:

> if you're a casual user, why in the world would
> you buy 64 grams of heroin for $8,000? Doesn't
> make any sense at all. That's like if you're a wine

---

[7] "Also, on that phone number 18, incoming message, 'I now'—probably means [know]—'I now that I was seeing if yo little brother had an E.' 'E,' we know, means … an eighth of a kilogram of cocaine. Mr. Carswell says, 'Let me check,' and then he provides that phone number, apparently, his little brother."

> drinker, going to the liquor store and buying, I
> don't know, half a truck load or something, just
> because you might drink it in the next 10 years
> or so.

Recall that the evidence was that Carswell possessed 64 grams of heroin, that a typical dose is 0.1 grams, but that some heavy users might use as much as three grams per dose. (We see no evidence at all that Carswell was such a heavy user.) Carswell says the government's analogy with ten years of wine inflated the amount of heroin he possessed by roughly sixty times the actual amount. We find no reversible or plain error here. This is the kind of loose analogy ("I don't know," the prosecutor said) that jurors were unlikely to treat as precise. If a timely objection had been made, the judge might have been able to order the government to make it more precise. On the other hand, an objection demanding clarification or correction might have focused more attention on the analogy that it deserved. In the absence of an objection, the judge was not obliged to intervene on this rhetorical flourish.

Finally, Carswell complains about this statement in the prosecutor's rebuttal:

> consider the surrounding circumstances, consider the context, consider the totality of the evidence to decide whether an individual simply intended to use this massive ball of heroin, as [defense counsel] describes it, or whether he was intending to distribute it.

Carswell argues that the "massive ball" phrase misquoted defense counsel when it was too late to respond. Defense counsel had referred to it as a "ball of heroin" and as "a simple ball

of heroin." We do not read the prosecutor's comment as necessarily attributing "massive" to defense counsel, but that point is not decisive. Both counsel "spun" the undisputed quantity, one labeling it "simple" and the other "massive." Counsel in closing arguments spin and sometimes misstate the evidence. That's why this judge and virtually all other judges instruct juries to focus on the evidence and to discount what counsel say in closing. And when counsel misstate the evidence, a timely objection can lead to a quick fix by the judge. The use of "massive" did not amount to a plain error that denied Carswell a fair trial or due process of law.

The key evidence against defendant Carswell was seized under a proper search warrant, and he was convicted in a fair trial. The judgment of the district court is AFFIRMED.